UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                  CRIMINAL NO. 17-20632

v.                               Hon. STEPHEN J. MURPHY

D-2 TERRY KOVAC,

        Defendant.

_____/

## Government's Sentencing Memorandum

Defendant Terry Kovac, together with other grown men, preyed on preteen and teenage girls through unmonitored internet chatrooms. Kovac, in fact, worked with two different groups of men to exploit these girls. Kovac and his cohorts pretended to be teenage boys to lure the girls from regular social media websites to the unmonitored chatrooms. Once the girls entered these chatrooms, Kovac and his partners would manipulate, entice, coerce, and direct the victims to undress, masturbate, and do other sexual acts live on web camera. What these naïve victims did not know was that the boys they interacted with were really middle-aged men who systematically targeted them and used time-tested techniques to break down the girls' defenses to get them to engage in

sexual activity.  The victims also did not know that Kovac and his friends talked in a separate chat string, just among themselves, about how to best coerce the girls.  In a contest against a well-organized, experienced groups of older men, these children were no match.

Kovac and others recorded the sexual activity and shared it among themselves.  The men engaged in the mass manipulation of these girls whose lives will never be the same.  Hundreds of victims feel prey to Kovac's groups.  For his crimes, the Government recommends the Court sentence Kovac to 50 years in prison.

## I
## STATEMENT OF FACTS

The principle group of which Kovac was a member will hereafter be referred to as the Skype Group, because they planned, organized, and strategized their activities through a series of private chat threads on the social media application Skype.  Their activity started in 2013 and continued until their arrests in April of 2017.  The websites used by the group, the group's characteristics, examples of their chats among themselves, examples of their coercion of the victims, the results of a search warrant execution on Kovac's devices, his confession, and victim information are all addressed in turn.

### A. Website A and Website B

Kovac met the other Skype Group members on social media websites where men tried to convince both adults and minors to strip naked on web camera.  The problem for the Skype Group was that many social media websites are monitored for sexual activity, and certainly for sexual activity involving children.  Thus members of the group would often be banned from these more popular social media websites for enticing minors to engage in sexual acts.  So the group found two unmonitored websites—Website A and Website B—to conduct their criminal activity without the threat of being censored.

Both Website A and Website B were chatroom-based social media platforms where people, using usernames of their choosing, went to different chatrooms and communicated with other users in real time. Unlike moderated websites, there was no central list of chatrooms on Website A and Website B.  Therefore, users had to know the specific chatroom they wanted to go to in advance, or receive a link to that chatroom.  Each chatroom had a list of users in the lower right corner of the screen, an active chat conversation on the lower left corner of the screen, and a large space above for individuals to live stream their

activities via web camera.  At any given time, up to two users could broadcast their activities via web camera.  A typical chatroom looked like this:



Website A, featured above, was used by hundreds of men—some working in concert with others (like Kovac did) and some working alone—to sexually exploit preteen and teenage girls.  With so much competition, however, the Skype Group created its own website, Website B, which looked similar to Website A.  Website B lasted for less than two years before it was shut down and the Skype Group resumed its activity on Website A.

### B. Roles and Rules of the Skype Group

To successfully lure girls to Website A and convince them to engage in sex acts on camera, the Skype Group members served different roles: hunters, talkers, and loopers.   Regardless of what role or roles each member played, the whole group relied on other members playing these roles as part of the criminal enterprise.

*Hunters*.   The "hunters" visited social media websites commonly used by teenagers to hunt for minor victims.   Hunters were in charge of convincing the girls to logon to Website A or Website B.   They provided the girls with links to specific chatrooms used by the group.   Hunters then reported to the group (most often in the Skype Group discussion threads) about the girl they hunted and provided other group members with the link to the chatroom they gave to the girl.   One Website A user described "hunting" this way:

> A hunter chooses a website called – you can call it hunting ground if you want . . . they choose a website.  They go there . . . Low viewer counts are always ways to avoid competition with other groups.  And it can also be used as a tool for enticement and coercion.  Because if you're broadcasting, you want people to talk and interact with.  If they're not there, well, that's a tool.  Come over here.  There's people over here ready to talk to you.  And minor females, for the most part, want people to talk to and some sort of attention based on what I've seen . . . a hunter's primary job was procuring

targets and minor female victims for sexual exploitation and redirecting them to a specific location created by the hunter.

████████████████████████████████████

██████████

*Talkers.*    Once the minors logged-on, the "talkers" took over the primary job of conversing with them.    They asked the minors to do "dares" which escalated into sexual activity.    One Website A user explained that the talker's job was to "make the victims feel wanted . . . to slowly, through words and coercion and enticement try and get them [] moving towards committing acts of sexual nature."    (*Id.* at 404).    This was true even though many victims displayed mental health issues.    For example, one Skype Group member told the FBI that many of the minors they targeted engaged in self-mutilation by cutting themselves.    If a girl said she was suicidal, it was a group rule to engage in "normal conversation" with her for two to three days before again asking her to engage in sexual activity.    In this way, they would build the minor target's trust, so that she would be more likely to comply with their directions in the future.

*Loopers.*    If the "talkers" were unsuccessful, then the "loopers" played a previously recorded video of a minor actively chatting and performing sexual acts in a chatroom.    The "looper" pretended to be the

minor in the video.  The "looper" played the video or "loop" of a minor engaged in sexual activity in order to entice the minor in the chatroom to engage in the same sexually explicit activity.  According to one Website A user, the looper's first task was to "convince[] the girl that the loop is real . . . and there are ways to do that.  Most of the younger females are ignorant of how live people really act all the time . . . and that's where the talkers come in.  They keep constantly redirecting her thought process in certain ways in order for her to take the loop for granted.  Most of the younger females . . . they're not as tech savvy as the more older ones."  (*Id.* at 404-05).

Whenever the group used the strategy outlined above—hunting, talking, looping—to successfully convince a victim to undress or masturbate in a chatroom, many members of the Skype Group, including Kovac, secretly recorded the activity.  They did this not only to permanently preserve what the group referred to as a "win," but also to share the child pornography with one another.  In fact, the Skype Group had a file-sharing system that was password protected for any group member who missed a particular night.  Website B even had an auto-recording system, so that the group members had recordings of

every single minor who went on camera at their fingertips.  They aptly dubbed their recordings of the preteen and teenage girls "captures."

As a criminal enterprise, rather than a collection of independent actors, the Skype Group established rules for group members to follow. These were detailed in a txt document entitled "FIGHT CLUB" (borrowing on the popular 1999 movie of the same name with the most famous line being "the first rule of Fight Club is we don't talk about Fight Club").  As that document explained, "there are certain rules which can't be discussed and violating them leads to an instant ban from this group." *See* Gov. Exh. B, Fight Club rules.  Among the group's rules were prohibitions against "hoarding / contacting [the girls] outside of the chat." This rule underscores the interdependence the group members have on one another.  Within the Fight Club document, moreover, are group strategies "which have proven successful in the past."  These strategies include avoiding too much talk with so-called "boring" girls, trying "to be on the same page" and "sticking together," and not "step[ping] into others chat" (i.e., group members were required to either stay quiet if they joined when a girl was about to engage in sexual activity or else leave the room so as not to interfere with the other members' work).  *See* Gov. Exh. B.

Beyond roles and rules, the Skype Group used its own terminology. As previously noted, successfully enticing a child to produce child pornography was considered a "win."  And a "cap" was short for a captured video of child pornography produced by the group.  Finally, the Skype Group identified victims' ages by using a "minus" symbol from 18; so an 11 year-old girl would be "-7," a 13 year-old girl "-5," a 15 year-old girl "-3," and so on.

### C. Group Chat Examples Among the Group

As indicated above, Kovac and his cohorts used lengthy chat discussions (usually on Skype) to strategize their crimes.  The FBI recovered several of the group's discussion threads.  The first of the recovered threads ran from at least January 2015 through January 2016 and was entitled "make girl happy n horny = pussy ;)."  Others included "Chat," "Club Cameltoe," and "Group V2.0."  *See, e.g.,* Gov. Ex. C, Examples of Group Chat Discussions, Filed Under Seal.

Kovac was an active participant in the private Skype Group discussion threads.  In the recovered chats, he wrote more than 15,000 messages to his co-conspirators.  This does not account for the years of group chats not recovered by the FBI.  Kovac's participation spanned

multiple years.  The overwhelming majority of Kovac's messages related to victimizing the children in this case.  Kovac (using the moniker Chris) frequently shared links to chatrooms or social media profiles of the victims in this case.  Kovac also shared the child pornography produced by the group.  When one young victim went to the bathroom to record activity, other group members voiced concern in the group-only chat that she would delete the recording.  Kovac assured the group, "I'm recording it" and promised to "up" (short for upload) it to the group later.  *See* Gov. Ex. C.

Kovac also looped to the victims.  This meant he used other people's videos involving sexual activity—sometimes boys, sometimes girls—and played off the recorded video as though it was happening in real time.  About a new loop he made involving a young male, Kovac told the other group members, "all of his stuff is gay hard to find,…. It's an hour long loop. :P I recorded it and went to work."  Other group members then discussed which victim would like the new loop the best.  As a looper, Kovac perpetuated the cycle of exploitation.  That is, Kovac used another person's videos, without that person's consent, to sexually exploit new victims.  *See* Gov. Ex. C.

Kovac served as a moderator for some rooms on Website A. In this role, Kovac could kick people out of rooms that did not assist the Skype Group in the exploitation of girls. Sometimes, Kovac used this power to press a reluctant victim to either produce sexual activity or be banished by the group. Regarding one particular victim who the group was frustrated with, Kovac wrote, "I just want to dick loop her now…. Her attitude sucks ass…we cant be so nice to all of them all of the time…. She is a lost hope." Kovac often spoke crassly like this about the girls. For one victim whose appearance changed since she first appeared on Website A, Kovac said, "looks like [MV] got ugly and looks a lil chubby." In describing all of the teenage and preteen victims on Website A and Website B, "just face it they are all attention whores." *See* Gov. Ex. C.

## D. Group Chat Examples with Victims

The investigation into the Skype Group also resulted in the recovery of several chats between the group and its victims. Kovac was an active "talker" and "looper" for the group. He engaged in extremely vulgar and sexually explicit conversations with teenage girls in order to get them to masturbate with different objects and to show their naked bodies on camera. For example, below is a still image from an

approximately 15-minute long video where Kovac and other group members enticed MV-20 to engage in sexual activity on Website A. MV-20 complies with their directions and encouragement in the video, going into the bathroom, taking off all of her clothes, and masturbating with an object.  *See also*, Gov. Ex. D, Website A Group Enticement Examples, Filed Under Seal.  A few of Kovac's comments during the video include: "I can you all over me you are so wet," "MV-20 yes faster," and "I want to see you cum so hard."



Another example involved MV-8, who was 15 years old at the time of the chat listed below.  In early 2016, Kovac and others enticed MV-8 to insert an Easter egg into her vagina.  A short excerpt from the nearly 30-minute recording is below:

```
DOMINGUEZ:    mmmmm
MASSEY:       nice
KOVAC:         [tongue out emoji]
KOVAC:        yummy
ROBINSON:     lucky egg
*****
KOVAC:         i want to stick my tongue in there
GM-1:[1]       mmmm
MASSEY:       damn that's hot
DOMINGUEZ:    so damn nice
ROBINSON:     best tasting eggs ever i bet
GM-2:         mmm
KOVAC:        i want to hunt for it
```

Later, the group convinced this same victim to engage in sexual activity with her dog.  When she expressed some concern, the group encouraged her to continue.  Kovac assured her, "it will be fine."  Other comments Kovac made during the video included: "press it hard against your clit"

---

[1] Throughout the exhibits and this memorandum, the name of an unidentified girl who is believed to be a minor is replaced with **MV** and group members who have yet to be identified are replaced with **GM** followed by a number.  The usernames of group members who have been identified and charged in either a criminal complaint or indictment are replaced with their real names.  The chats in the exhibits and memorandum have been transcribed into a word document from their original format and are excerpts from videos and/or Skype conversations.

and "that's hot af" and "looks like it feels so amazing."  This victim, MV-8, would go on in another chat to express suicidal thoughts to the group. They mocked her for it among themselves in their Skype chats.

### E. Kovac's Arrest, Statements, and Forensic Examination Results of his Electronic Devices

Eventually, the FBI caught up with Kovac.  On August 1, 2017, the FBI executed a search warrant at his residence in Sparks, Nevada. Kovac lived alone in a one-bedroom apartment.  Kovac made several significant admissions when talking with the FBI, including that he:

- was Chris of the Skype group;

- was a "talker" for the group;

- masturbated to child pornography 1-2 times per week;

- was on Website A every day for about two years;

- recorded victims' activity;

- pretended to be a 15-16 year-old boy while on Website A;

- used a "loop" of a 15-16 year-old boy;

- distributed recordings to other group members;

- has downloaded child pornography of children under the age of 10;

- first started masturbating to child pornography 10 years ago.

The FBI recovered numerous electronic devices from Kovac's residence. These are the tools with which Kovac participated in the child exploitation enterprise. As of the date of this memorandum, the FBI has only been able to analyze approximately 6.7% of the content on Kovac's devices because of the vast quantity of data they contain. Kovac had over 18 terabytes of information on his devices. The partial forensic examination of Kovac's devices has so far revealed 48,392 child exploitive images and videos, over 1,724 child pornography images, and approximately 1,405 child pornography videos. The child pornography videos date back to May 2013. The longest child pornography video was 2 hours and 9 minutes; the total length of his child pornography and child exploitive video collection spanned nearly 900 hours.

Kovac recorded multiple child pornography videos of numerous victims from Website A and Website B. To give just a few examples, he recorded 6 child pornography videos of MV-10 and another 59 that were

child exploitive.[2]  He recorded 26 child exploitive videos of MV-11.[3]  He recorded 11 child pornography videos of MV-27[4] and 22 that were child exploitive.  And, he recorded numerous child pornography and/or child exploitive videos of MV-8, MV-21, and MV-35.  Along with the child pornography videos, Kovac recorded these young girls doing things like rubbing or showing their breasts, hanging out with friends, and napping.

Some of the ways Kovac titled the videos he recorded demonstrates his depravity and what he thinks of the children he exploited.  For example, the videos he saved used terms like the following: "sexy ass twerk;" "girl spread shows her . . . ;" "whatever the bitches name is . . .;" "tight lil shaved pussy;" "curlion iron bate n moaning."

The content of those videos, moreover, is disturbing.  A video of an unidentified minor, referred to by the FBI as MV-60, spans 58 minutes. The video shows this girl, who is approximately 15-17 years of age,

---

[2]  MV-10's mother plans to address the Court at sentencing. MV-10 was 13 when she was first victimized by the group.

[3] In the wake of her exploitation by Kovac and others, MV-11 attempted suicide, was hospitalized, was enrolled in a $60,000 program, and has just recently returned to her parents' home.

[4] MV-27 was 15 and her parents report that she struggled immensely because of the offense conduct.  *See* Gov. Ex. A-27, Victim Impact Statement for MV-27.

bathing, masturbating with a hairbrush, and involving her dog in sexual activity.  Kovac thought enough of this video to keep it.  Another video recovered from Kovac's devices involved two victims: MV-21 and MV-41. This video is 1 hour 12 minutes and 56 seconds long.  It starts with MV-21 and MV-41 sitting on a bed wearing a black tank top and a green shirt, respectively.  MV-21 then puts on a pink t-shirt and displays her buttocks and genitals to the camera.  After simulating oral sex on a phallic object, she displays her genitals to the camera and inserts the object.  MV-41 is then depicted on the screen for a period, then MV-41 and MV-21 both simulate oral sex on similar phallic objects.  MV-41 briefly inserts the phallic object into her vagina and then both MV-21 and MV-41 masturbate by inserting the phallic objects while sitting next to each other and displaying both of their vaginas to the web camera.  Again, Kovac kept this video.  These serve as just examples of the types of videos the Skype Group sought.  The FBI's investigation has shown that the group consistently asked its victims to engage in increasingly depraved sex shows, especially masturbating with objects and using animals in sexual acts.

Login information provided by Website A showed the frequency with which Kovac was involved in the child exploitation enterprise. In the fourteen-month period from April 3, 2015, to June 15, 2016, Kovac logged into Website A 6,054 times. That averages out to approximately 14 logins every single day. Kovac's conduct, moreover, continued right up until the FBI executed the search warrant at his home. The forensic analysis of Kovac's devices revealed that Kovac's recordings were dated up to two days before the search warrant execution.

Finally, unlike other members of the Skype Group, Kovac had child pornography involving infants and toddlers among his collection.

## F. Victim Information

Hopefully not lost in all of the numbers listed above is the individual impact of the manipulation on each victim. The consequences were devastating.

Several victims have provided the Court with victim impact statements. MV-1 wrote that she is "humiliated" and "mortified" that she was tricked into engaging in this conduct. "My work in school has lost its quality, my life at home felt like hell from day to day in high school, my friends turned into foes, and I lost my spirit to live a happy

life." *See* Gov. Ex. A-1, Victim Information, Filed Under Seal.  MV-66 explained that during her period of victimization, she suffered from anxiety and depression.  She turned to the internet so she could be herself.  But the Skype Group awaited her.  Since learning that recordings were made of the sexual activity she engaged in, MV-66 explained her feelings this way: "It has been tearing me to pieces just wanting to know who's seen them and how much they were spread.  I've been just disgusted with myself and haven't been motivated to do anything. . . . This case will be on my mind till the day I die." *See* Gov. Ex. A-66, Victim Information, Filed Under Seal.

Letters from the parents prove equally heartbreaking.  MV-27's parents described how their daughter's grades fell, she lost weight, and did not make friends at school.  MV-27 now sees a therapist and takes medication, but that medication "comes with a price.  She has no real emotions anymore or any real heartfelt expressions coming out."  *See* Gov. Ex. A-27, Victim Information.  MV-8 and MV-15 are sisters.  Their mother wrote a letter to the Court.  MV-8 "spent a long time crying every night… her sleep declined… we now see a counselor regularly."  MV-15

has "retreated" from the happy little girl she was prior to falling victim to this group.  *See* Gov. Ex. A-8, A-15 Victim Information.

These crimes likewise have a lasting impact on the parents of the victims.  Most blame themselves, while others mourn the loss of the daughter they knew.  MV-27's father described how his daughter doesn't hug him in the morning any more.  MV-4's parents explained how the crimes tore a hole in the relationship between MV-4 and her mother. That whole family feels "distraught, embarrassed, and shocked that something like this could have happened to our daughter and family." *See* Gov. Ex. A-4, Victim Information.  The mother of MV-8 and MV-15 wrote, "I worry about them every day."  As for the offenders, she wonders: "They have changed our lives forever, where we won't be the same.  Will they feel this for the rest of their lives?"

For other girls, their victimization was simply too much for them to handle.  MV-11, victimized by the group at the age of 14, attempted suicide soon after authorities got in touch with her parents about Website A.  She then spent months at an intensive, in-treatment facility far from home.  She missed a year of school.  Given her recent progress, that family will not be attending the sentencing hearing.

Likewise, MV-53 (who was 16 years old at the time of the offense) attempted suicide and was hospitalized two times in 2017; the second time, she drank half a bottle of Benadryl. She has been cutting herself and also physically hurting herself by slamming her head against the wall. Her parents have been trying to find money to get a permanent therapy dog for MV-53. MV-52 (who was 15) reported that people on Website A blackmailed her, telling her that if she did not perform certain sexual acts, such as spreading her "ass," "finger[ing] her pussy," and "shaving" around her vagina, they would spread her pictures all over the Internet. When she stopped doing what they asked, someone on the website reached out to her and explained that he knew her address and was in her city and coming to visit her. When she told them her mom was with her, the individual said he was going back home. *See* Gov. Ex. A-52, Victim Information.

MV-50 (who was 16) struggles with cutting, is in therapy, and is on medication for depression. MV-54 (who was 12) now has a post-traumatic stress disorder diagnosis, is on medication and in counseling, and was recently sexually assaulted. MV-55 (who was 13 or 14) was blackmailed by a Website A user. The user made her write "slut" on her forehead with

lipstick, told her he knew what high school she was going to and that he was going to move there, found her Facebook profile, and found out who her parents were and threatened to send them sexually explicit photographs if she did not keep doing what he asked.

Finally, several victims will appear at sentencing to tell the Court and Kovac how these crimes changed their lives. And while the government urges the Court to consider all of these victim impact statements in fashioning the sentences in this case, it should be noted that the FBI has identified just 48 victims of the Skype Group. There are over a hundred more who remain unidentified and who will not be able to tell the Court their stories.

## II
## ADVISORY SENTENCING GUIDELINES

The Guidelines in this case are not in dispute. The parties agree that Kovac is a criminal history category I with an offense level 43, resulting in a Guideline range of life imprisonment. (PSR ¶ 96).

## III
## SENTENCING FACTORS, 18 U.S.C. § 3553

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered by sentencing courts in imposing

a "sentence sufficient, but not greater than necessary."  Those objectives are: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for a sentence to reflect the basic aims of sentencing (including retribution, deterrence, incapacitation, and rehabilitation); (3) the kinds of sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need for restitution.

The most relevant factors are evaluated below, beginning with number 4, the sentencing guidelines.

## A. The Advisory Guideline Range

In *United States v. Rita*, 551 U.S. 338 (2007), the Supreme Court restated that the goals of the United States Sentencing Commission in formulating the Sentencing Guidelines are to carry out the objectives of 18 U.S.C. § 3553(a).  Despite their being advisory, rather than mandatory, the Guidelines remain an important factor in fashioning a just sentence.  As the Supreme Court stated in *Rita*, "it is fair to assume

that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *Id.* at 345.

In *United States v. Vonner*, 516 F.3d 382, 389 (6th Cir. 2008), the Court in analyzing the holding in *Rita*, recognized that the guidelines represent the Sentencing Commission's attempt to reconcile the factors under § 3553(a), that these factors seek to balance Congress' competing interests in consistency and that a confluence between the national views of the sentencing commission and the independent views of a sentencing judge results in a "double determination" which significantly increases the likelihood that a sentence is reasonable.

As indicated above, the parties agree that the sentencing guidelines in this case are life in prison.

## B. The Nature and Circumstances of the Offense

The nature and circumstances of the offense warrant the Government's requested 50-year sentence.  Kovac was one of the principal participants in two different international, multi-year child exploitation enterprises.  Over one hundred victims fell prey to these groups.  And Kovac was in the center of it all.  In the group's lengthy discussion threads where they coordinated their attacks on these girls,

Kovac wrote more than 15,000 lines of text to his confederates.  His computers contained thousands of child pornography images and videos, and tens of thousands of child exploitative videos (where the group groomed, manipulated, and pressured girls to display their naked bodies).  The login information from Website showed him on that website 14 times per day during one period of his conduct.  Kovac himself admitted to spending multiple hours every day on Website A.

Kovac's individual comments to victims, and about victims, underscored his depravity.  When MV-8 masturbated with an Easter egg, Kovac told her "I want to hunt for it."  In a separate chat, he and the other group members mocked MV-8 for being "emo" (short for emotional) and for "suicide drama."  She was 15 years old at the time.  He encouraged dozens of girls, including MV-20, MV-8, and MV-66, to masturbate.

The results of the forensic examination of Kovac's devices are important in analyzing the nature and circumstances of the offense. Kovac had thousands of videos, often very lengthy, of the victims from Website A and Website B.   Kovac's collection involved particularly lengthy videos (with a total length spanning more than 900 hours).  He created recordings of girls showering and engaged in bestiality, and he

was a part of the "team" that enticed these girls to do all of those things. And unlike many of his co-defendants, Kovac's collection included child pornography involving infants and toddlers.

## C. History and Characteristics of the Offender

Kovac's personal characteristics are unremarkable. Kovac is 49 years old, single, with no children. (PSR ¶ 66). He had a fairly stable upbringing and continues to have the support of his parents. (PSR ¶¶ 60-63, 69). Kovac has no medical, mental health, or substance abuse issues. (PSR ¶¶ 70-77). He has maintained steady employment, but does not appear to have any significant hobbies or activities beyond his participation in these two child sexual exploitation enterprises. (PSR ¶¶ 83-92). Nothing about Kovac's history or characteristics warrants a departure or variance from the guidelines range.

## D. The Sentence Imposed Must Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

A 50-year sentence here properly reflects the purposes of sentencing. The offense of child exploitation enterprise is incredibly serious as it involves multiple defendants working together to exploit multiple victims. Congress identified the seriousness of child

exploitation enterprises when it set the minimum penalty at 20 years, which is the highest minimum punishment set forth in federal law for first-time, non-homicide offenses. But the Skype Group's conduct exceeds even the regular child exploitation enterprise. Kovac and other group members produced child pornography of hundreds of minor females over the course of several years, and enticed countless others. They manipulated, lied to, badgered, and tricked their victims.

Some of these victims were targeted on a weekly or daily basis by the group. For example, the group convinced MV-8 to masturbate with numerous objects on a weekly basis for more than a year. Several of these girls carried on relationships with Website A users, believing they were dating them and calling them their boyfriends. Their "boyfriends" continually asked them for sexual videos and images, which they provided in order to keep the relationship going. For some, the sudden, unexplained end to the relationship when their "boyfriend" lost interest was devastating. It led them to spiral into a deep depression and seek mental health treatment.

This group has normalized sexual behavior that is completely abnormal. They have robbed these young minor girls, some as young as

ten-years old, of their innocence.  They have taught them that they are only special and will only get attention and "fit in" with others their age if they are willing to let others exploit their bodies.  For those that have been identified, hopefully their parents are able to help bring healing and restore them day by day.  But, for those that are not identified, there is no telling what damage Kovac's group has done, and whether they will ever be able to live productive, healthy lives.

To promote respect for the law, a sentence far above the mandatory minimum must be imposed.  Adequate punishment here—which in this case is difficult to quantify—should be measured in terms of decades, not years, in prison.

### E. Deterrence

A significant prison sentence for Kovac will send a general deterrence message to other, like-minded individuals.  Because the Internet allows users to maintain anonymity, an offender need only have recording software and knowledge of an unmonitored website to do what this group did.  The recording software that the majority of them used is free and can be downloaded by anyone with the click of a button.  Moreover, as this group's conduct demonstrates, it has become

increasingly easy for groups like this to create their own websites (like Website B) to target minors.  Thus, deterrence in these types of cases is of incredible importance.  Potential offenders who think about doing what this group did, which has left permanent scars on so many young girls, should know that, if they are caught, they will likely spend the rest of their lives in prison.

Most importantly, a **50-year** sentence is necessary to protect the public.  Kovac only stopped his criminal conduct because the FBI broke down his door.  Victims discussing suicide did not stop him.  Victims cutting themselves did not stop him.  Victims as young as 12 did not stop him.  Hearing of the possible arrests of others did not stop him.  Only a significant prison sentence will stop Kovac from hurting other children.

## F. Avoiding Unwarranted Sentence Disparities

A sentence of 50 years also avoids unwarranted sentencing disparities.  Here, this group's conduct is at an entirely different level than most child exploitation offenses (even other child exploitation enterprises).  Kovac and his friends imposed what amounts to a life sentence on hundreds of minor victims who they actively exploited for

several years.  A sentence of **50 years** will not result in any unwarranted sentencing disparities.

The following chart sets forth the government's recommendations for each of the defendants in this case.  This provides just a snapshot of the differences in the conduct of the offenders, and therefore the differences in the government's sentencing recommendations for each defendant.

| **Defendant** | **CP Files** | **Activity** | **Sentence** |
|---|---|---|---|
| Terry Kovac | 3,129 and 48,392 child exploitive so far (only 6.7% of forensics complete) | • On Website A almost daily up to the date of the search warrant<br>• Also on Website B<br>• In two different groups<br>• Exploited minors for at least 6 years on Website A<br>• Talker and looper<br>• Interested in minors under the age of 10 and masturbates twice a week to minors on Website A | 50 years |
| Felipe Dominguez-Meija | 9,479 and 15,735 child exploitive so far (only 5.5% of forensics complete) | • On Website A almost daily all the way up to the date of the search warrant<br>• Active on Website B<br>• One of the most aggressive talkers and very active in the Skype Group chat<br>• Actively exploiting girls for at least 5 years | 40 years |
| Noel Eisley | 2,730 and 9,527 child exploitive so far (only 4.5% of forensics complete) | • On Website B regularly – stopped frequenting the group in early 2016 but continued to target minors one-on-one<br>• On Website A regularly starting at least as early as 2012 and through early 2016 | 40 years |

| | | | |
|---|---|---|---|
| | | • Actively exploiting children for more than four years<br>• Talker and Looper | |
| Bret Massey | 7,635 and 15,747 child exploitive | • On Website A on a near daily basis for two to three years<br>• Also active on Website B for short period of time<br>• One of the more aggressive talkers in the group and very active in the Skype Group chat; also had a loop that he occasionally used | 35 years |
| William Phillips | 1,803 and 5,908 child exploitive | • On Website A on a near daily basis for five + years up through the date of the SW (laptop active on Website A during SW execution)<br>• In two different groups<br>• Looper, hunter, and talker<br>• Very active on Skype with co-conspirators<br>• At least one identified minor in EDMI believed he was her boyfriend and he carried on a relationship with her resulting in significant trauma | 30 years |
| Eric Robinson | 6,647 and 28,700 child exploitive so far (only 18.2% complete) | • On Website A on a regular basis from 2012 up through the summer of 2016 when a search warrant was executed at his residence<br>• In two different groups<br>• Active on Website B and the Skype Group chat<br>• Talker and looper | 40 years |

# IV
# RESTITUTION STIPULATION

The parties stipulated to a restitution amount of $5,000 per identified victim of the offense.  The parties have prepared a restitution stipulation for the 48 identified victims.  The money shall be paid by the Defendant to the Clerk's Office, who will then make payments to the parents of the victims or the victims (if they are 18 at the time of sentencing).

# V
# CONCLUSION

The Government requests that the Court impose a sentence of

**50 years' imprisonment** followed by 10 years of supervised release.

Respectfully submitted,

Matthew Schneider
United States Attorney

s/Kevin M. Mulcahy
KEVIN M. MULCAHY
APRIL RUSSO
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9713
E-Mail: Kevin.Mulcahy@usdoj.gov

s/Leslie Fisher
Leslie Fisher
Trial Attorney
Department of Justice
Child Exploitation &
Obscenity Section

Dated:  July 10, 2018

**Certificate of Service**

I hereby certify that on July 10, 2018, I electronically filed the

Government's Sentencing Memorandum for the United States under seal with the

Clerk of the Court of the Eastern District of Michigan.  I sent the memorandum

and attached exhibits via Fed-Ex to defense attorney.

Richard Korn
*Attorney for Defendant*
rdkorn@sbcglobal.net

s/Kevin M. Mulcahy
Kevin M. Mulcahy
Assistant United States Attorney
Detroit, MI  48226
Phone:  (313) 226-9713
E-Mail: Kevin.Mulcahy@usdoj.gov