1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                          SOUTHERN DIVISION

3
     UNITED STATES OF AMERICA,
4
                         Plaintiff,
5    vs.
                                    Case No. 17-20632
6    D-3 BRET MASSEY               Case No. 18-20128
     D-5 WILLIAM T. PHILLIPS       Hon. Stephen J. Murphy, III
7
                         Defendants.
8    _____/

9                          **SENTENCINGS**

10         BEFORE THE HONORABLE STEPHEN J. MURPHY, III
                     United States District Judge
11           Theodore Levin United States Courthouse
                   231 West Lafayette Boulevard
12                  Detroit, Michigan  48226
                    Wednesday, July 18, 2018
13
     APPEARANCES:
14
     For the Plaintiff          APRIL NICOLE RUSSO
15   United States of America:  KEVIN MULCAHY
                                LESLIE W. FISHER
16                              United States Attorney's Office
                                211 W. Fort Street
17                              Suite 2001
                                Detroit, Michigan 48226
18                              313-226-9129

19   For the Defendant          SANFORD PLOTKIN
     D-3 Bret Massey:           Sanford Plotkin, P.C.
20                              538 N. Division Street
                                Ann Arbor, Michigan 48104
21                              248-798-5756

22   For the Defendant          LISA L. DWYER
     D-5 William Phillips:      400 Monroe Street
23                              Suite 280
                                Detroit, Michigan 48226
24                              313-962-0000

25



1          To obtain a certified copy of this transcript, contact:

2              Linda M. Cavanagh, CSR-0131, RDR, RMR, CRR, CRC
                        Official Court Reporter
3                (313) 234-2616 • www.transcriptorders.com

TABLE OF CONTENTS

Page

SENTENCING AS TO D-3 BRET MASSEY:

Allocution by Mr. Plotkin............................8
Allocution by Defendant Massey.....................15
Allocution by Mr. Mulcahy..........................17
Comments/Sentencing by the Court...................23

SENTENCING AS TO D-5 WILLIAM T. PHILLIPS:

Allocution by Ms. Dwyer............................38
Allocution by Defendant Phillips...................45
Allocution by Ms. Russo............................48
Comments/Sentencing by the Court...................56

EXHIBITS

| Identification | Offered | Received |
| --- | --- | --- |
| Government Exhibits G and H,<br>Victim Impact Statements | | 7 |

Sentencings • Wednesday, July 18, 2018

4

```
 1              Detroit, Michigan
 2              Wednesday, July 18, 2018
 3                        —  —  —
 4              (Proceedings commenced at 11:53 a.m., all parties
 5              present)
 6              THE CLERK:  Court calls Case No. 17-20632, United
 7    States of America versus Bret Massey and William T. Phillips.
 8              Counsel, please state your appearances for the
 9    record.
10              MS. RUSSO:  Good morning, Your Honor.  April Russo,
11    Kevin Mulcahy and Leslie Fisher on behalf of the United States.
12              MR. PLOTKIN:  Sanford Plotkin with Mr. Massey.
13              MS. DWYER:  Your Honor, good morning.  Lisa Dwyer
14    appearing on behalf of William Phillips.
15              THE COURT:  Okay.  Good morning.  Welcome to
16    everybody and go ahead and have a seat.
17              We don't have much morning left.  We are continuing
18    to progress through a total of sentences on six cases.  We had
19    four yesterday and two more today.  The case is 17-20632 and
20    Mr. Massey is going to go first?
21              MR. PLOTKIN:  We can, that's fine.
22              THE COURT:  Okay.  All right.  Let me invite Mr.
23    Plotkin and Mr. Massey to come on up to the microphone.
24              MR. PLOTKIN:  Thank you.
25              THE COURT:  Thank you.
```

```
 1              MR. PLOTKIN?  Any preference which side Mr. Massey
 2   is?
 3              THE COURT:  No preferences.  I'm a guest here so...
 4              MR. PLOTKIN:  Thank you.  So are we.
 5              THE COURT:  Yeah.  All righty.
 6              MR. PLOTKIN:  Well, the marshal has spoken.
 7              THE COURT:  Mr. Massey, have you had an opportunity
 8   along with Mr. Plotkin, your lawyer, to read the Pre-Sentence
 9   Report along with any revisions that might have been made to it
10   after it first came out?
11              DEFENDANT MASSEY:  Yes, Your Honor.
12              THE COURT:  Okay.  Very good.  The report came out
13   initially on March 1.  It does not look as if there were any
14   significant modifications made to it.  Neither the United
15   States nor the defendant through Mr. Plotkin lodged any
16   objections to the -- to the report, and I would simply ask you
17   now, Mr. Plotkin, whether or not you want to make any
18   corrections, augmentations or objections to the report that's
19   on file.
20              MR. PLOTKIN:  No, Your Honor.
21              THE COURT:  Okay.  Very good.  Mr. Mulcahy, are you
22   comfortable with the terms of the probation officer's report as
23   well?
24              MR. MULCAHY:  We are, Your Honor.  We have no
25   objections.
```

```
1            THE COURT:  All right.  Very good.  The Court will
2    find that the total Offense Level is 43, the Criminal History
3    Category is I, and the guideline range at that level is life in
4    prison.  The guideline provisions in the Plea Agreement are the
5    same, so the terms of the Pre-Sentence Report along with the
6    factual findings of the Probation Department will be those of
7    the Court for purposes of this hearing only.
8            And I know Mr. Plotkin was present for quite a few of
9    our sentences yesterday.  We did have extensive victim
10   testimony.  I have looked at a large book of victim impact
11   statements.  And I would just ask the United States Attorney
12   whether or not we're going to be considering any victims'
13   testimony or other matters who are present today.
14           MR. MULCAHY:  There are no victims present today who
15   have not already testified before Your Honor.  However, last
16   night we did receive two additional victim impact statements.
17   They are both been given to Mr. Plotkin as well as Ms. Dwyer
18   and I've copies for the Court if I could tender them at this
19   time.
20           THE COURT:  Yes.  If you want to bring those up to
21   Mr. Parker, that'll be fine.  And those are relevant to the
22   entire enterprise and Mr. Massey as well I take it, correct?
23           MR. MULCAHY:  That is correct, Your Honor.
24           THE COURT:  Okay.
25           MR. MULCAHY:  And beyond those two additional victim
```

1    impact statements and the folks that the Court heard from

2    yesterday and the letters the Court has received, that is the

3    entirety of our victim information at this time.

4         THE COURT:  All right.  So those are from MV-31 and

5    MV-61.  They've been given to the defense attorneys.  They're

6    Exhibits G and F [sic] for purposes of this sentencing and I

7    will receive them for that purpose as well as for Mr. Phillips'

8    sentencing as well.

9         Now, the Preliminary Order of Forfeiture was

10   presented in the case earlier.  As I mentioned yesterday, I

11   reviewed that at length and I also heard from Mr. Ross.  All

12   six attorneys who were present yesterday agreed that they had

13   signed off on the forfeiture language that will go into the

14   Judgment and Commitment Order, so forfeiture will not be an

15   issue as to this sentence.

16        I find that there's no reason to impose a fine given

17   the nature of Mr. Massey's financial resources as well as the

18   restitution order that will likely be in place.

19        No fine or costs of incarceration will be ordered.

20        There is an agreement that each defendant in this

21   particular case pay a $5,000 -- who's convicted that is -- pay

22   a $5,000 restitution award to each victim in the case for a

23   total of $215,000 in this.

24        MR. MULCAHY:  That's correct, Your Honor.

25        THE COURT:  Okay.  So we'll enter a -- by agreement a

1    restitution award in that amount.

2           I will not be entertaining -- or will I be?  Did you

3    make a 5K motion on this particular defendant?

4           MR. PLOTKIN:  Yes, they did.

5           MR. MULCAHY:  Yes, we did, Your Honor.

6           THE COURT:  All right.  Okay.  That's what I thought.

7    I didn't get into the specifics yet.  So I was going to say

8    there are no grounds for a departure but there may very well

9    be.

10           So what I will do is simply inform the parties that I

11   received Mr. Massey's sentencing memorandum that was written by

12   Mr. Plotkin.  I've also looked at the sentencing memorandum of

13   the United States.  And notwithstanding what I may have just

14   indicated, I am familiar with the memorandum in support of a 5K

15   substantial assistance downward departure, and I, based on the

16   representations made in it, will grant that now.

17           I don't believe I have any further letters or other

18   materials from Mr. Massey.  There is a separate agreement that

19   we all know about and that's it.

20           I would therefore consider the record complete and

21   the way clear for Mr. Plotkin to make any remarks he'd like to

22   issue on behalf of his client as to the appropriate sentence,

23   statements in mitigation or anything else at this time.  Go

24   right ahead.

25           MR. PLOTKIN:  Thanks.  Your Honor, I did sit through

1    three of the four sentencings yesterday.  As a result, I know

2    what Your Honor has heard, saw, seen, considered, and I'm not

3    going to repeat a lot of my colleagues' arguments.  I thought

4    they were very well said yesterday.

5           I thought some of these issues, they -- they -- they

6    apply to Mr. Massey.  I think Mr. Korn and some others talked

7    about considerations for variance based on age.  I spent a deal

8    of my memorandum to this Court discussing that issue, and I'm

9    not going to be a broken record vis-a-vis my sentencing

10   memorandum.

11          I've suggested to the Court numerous reasons to vary

12   from the advisory guideline range, but the fact is, as you

13   stated a couple minutes ago, you did just grant a motion for a

14   downward departure.  Mr. Massey's cooperation, according to the

15   government, if I read it right, and if I didn't I'm sure

16   they'll correct me, but my understanding is that, number one --

17   and I just want to talk about that for a minute before I get to

18   more personal issues.

19          The cooperation, when he was arrested, he sat down in

20   a car with some agents in May outside his house and gave a

21   recorded statement that I don't know if it was a couple hours

22   long but it was very comprehensive, it was voluntary, it was

23   without counsel, it was his own initiative, and it was really

24   an effort at that moment to start helping the government make

25   some sense of this and to fill in gaps in their investigation

1    which would continue, at least his attempts, as soon as he got

2    to Detroit, Your Honor.

3           Now, based on what he was able to do, I think it

4    aided in some complaints and search warrants which may yield

5    more defendants who've been involved in this, which anything

6    would be helpful because these people are all around the world

7    is my understanding, and if Mr. Massey was able to even

8    identify or help make a case on an additional defendant or two,

9    I think it's a tremendous help based on the numbers the

10   government talks about in terms of victims being affected by a

11   given defendant.  So clearly that 5K motion is made in earnest.

12          Now, the cooperation in the car to me also suggests

13   his state of mind.  Listen, I've been doing this for 32 years.

14   I know when a client's defiant and gives the finger to law

15   enforcement, and I know when a client sits down and the first

16   thing they do is give a two-hour recorded statement.  And also

17   he pointed out where a hard drive was in his apartment

18   underneath -- I'm not saying it was secreted, but if he hadn't

19   told them exactly how to find it, there's a good chance there'd

20   be a hard disk with a lot of material never recovered by law

21   enforcement.  And he knew that at the time and that's exactly

22   why he directed them to this specific hard drive, again I think

23   showing an attempt to do what he could at that point subsequent

24   to all this horrendous conduct.

25          Now, on a personal note -- so that's -- Court's aware

1    of the cooperation.  The Court has the 5K, the Court's granted
2    the 5K.  The Court has read my memorandum.  I talk about
3    reasons for variance.  I talk about this particular guideline.
4    I talk about Mr. Massey's age.  I talk about why there's a lot
5    of support for the fact that he probably won't re-offend, but I
6    want to take a different tact than the Court heard yesterday.
7    You've heard all the legalese.  I'm not going to repeat it.
8         When I sat there yesterday, Your Honor, there were a
9    lot of things going through my head listening to these victims,
10   listening to the stories that come from this case and the
11   defendant's conduct, and at some point I found myself
12   reflecting back on things that happened in my household growing
13   up.  There were things that happened in my house that happened
14   unfortunately in a lot of houses.
15        What I will say is this.  Watching my family grow up
16   over the years and seeing how events affect family members and
17   what helps family members' health, at the end of the day, the
18   cold reality is its access to mental health treatment.
19        Now, this case calls for life in prison.  I get it.
20   I get exactly -- and my opening in my memorandum I hope made
21   clear to the Court I understand exactly what has gone on with
22   the victims, and of course our hearts go out to their trauma.
23   But the reality is at some point excess incarceration will not
24   alleviate the trauma.  What is desperately needed is mental
25   health treatment.

1          Now, as a sad aside, in our country it's too bad we

2     don't value mental health treatment a little more and get some

3     of the insurance gatekeepers out of the way.

4          But be that as it may, I think that if restitution

5     could be made, I don't know how realistic it is, but that's

6     probably one of the best benefits of this prosecution as well,

7     to help victims get treatment that they desperately need as a

8     result of what happened to them by the defendants.

9          Now, punishment's necessary.  Punishment serves a

10    purpose.

11          THE COURT:  Right.

12          MR. PLOTKIN:  Feeling validated, being heard,

13    allowing society to see the pain inflicted, that's vital.  I do

14    understand that.

15          I also feel at the same time that you take a man like

16    Bret Massey.  I don't know if the Court really -- I guess my

17    biggest frustration this morning, Your Honor, is I really don't

18    know if I can convey my sense of Mr. Massey to this Court or to

19    the prosecution or to the victims.  I said in this memorandum a

20    very strong statement, that he orchestrated his self-

21    destruction through his participation in this case.  I -- I

22    tried to articulate my reasons.  I didn't pull that out of thin

23    air.

24          THE COURT:  Right.

25          MR. PLOTKIN:  I spent a lot of time with Bret Massey.

```
 1    I spent a lot of time on the phone with Allen Massey, his
 2    father.  I've reached my conclusions.  I feel in my heart of
 3    hearts that Bret Massey's work is done.  He's done himself in.
 4    He self-destructed.  He destroyed what could have been a
 5    promising future.  He's lost a chunk of his family.  He's lost
 6    his friends.  He's lost his career.  He's lost his sense of
 7    self, what could have been a promising self, and he destroyed
 8    it for tragic, tragic reasons.  He took out a rage on all the
 9    wrong people.
10            THE COURT:  Yeah.
11            MR. PLOTKIN:  And he caused a lot of harm in his --
12    and left a lot of trauma in his wake, and he knows that and
13    he'll speak to that in a minute.
14            But I guess my point is this.  And let me just say
15    one short thing and I'll get to the -- to the bottom line,
16    Judge.  But victim trauma, another thing that crossed my mind
17    yesterday -- well, I'm not going to go there.
18            I understand the passion for the utmost punishment in
19    a case like this, but like I said, I think at the end, you
20    gotta guy pushing 50, 20 years is a long time.  When I look
21    back on 20 years, there's a lot of life lived in -- in a
22    20-year period.  And it's gone, Bret Massey's future is gone,
23    his life is over.  If the Court gives him the mandatory minimum
24    of 240 months, his life's over.  He did that, he did it to
25    himself, he knows that.  And I guess I have a serious question
```

1   as to what is achieved.  Is it really not sufficient, is the

2   mandatory minimum not sufficient?  Your Honor will answer that

3   question momentarily.

4        I suggest that his motivation for doing what he did

5   is complete.  I don't see this ever happening again.  And the

6   question is can all of these needs be satisfied by a 20-year

7   sentence, and I suggest they absolutely can.  And I understand

8   why the Court may well go higher, I get it.

9        But again, in my heart of hearts, I want to leave you

10  on this note.  Bret Massey did this for reasons I've discussed,

11  and when they got to his door, it really shut down his

12  operation, his motivations.  His father will be dead when he

13  gets out of prison, probably before, possibly true with his

14  mother.  What -- what pushed him in this case so tragically is

15  gone.

16       Now, how do I wrap this up?  I guess I -- I'd just

17  ask the Court to -- to blend in the 5K along with what I did

18  discuss in the memorandum, which I stand by, and to give

19  serious consideration to how much is enough.  And to keep

20  society safe, to punish, to satisfy victims, in my heart I

21  truly know it can be done with a 20-year sentence.  I say that

22  knowing that for other reasons the Court may not find that

23  sufficient, but I sure do.

24       And I -- I really appreciate your -- your

25  consideration in all these yesterday and today.  Thanks.

1    THE COURT:  I have a great deal of regard for you,

2  Mr. Plotkin, and I have a great deal of respect for the work

3  that you do, and your memorandum was, as expected, honest,

4  forthright and compelling.

5    I also wove into what you had to say about your

6  client the nature of the personal section of the Pre-Sentence

7  Report, so I agree and under -- agree with and understand much

8  of what you -- what you say, and thank you for your hard work

9  as always.

10    MR. PLOTKIN:  Thank you.

11    THE COURT:  Mr. Massey has the opportunity on his own

12  behalf to make any statements about the -- the sentence, the

13  circumstances, mitigating factors or anything else.  Go right

14  ahead, Mr. Massey.

15    DEFENDANT MASSEY:  Thank you, Your Honor.

16    First I'd like to apologize to the victims and the

17  families.  I -- I -- I can't know what they went through.  I

18  can't know what they're going through.  I can't know what

19  they're going to go through.  I know the apologies may seem a

20  bit hollow because we were stopped because we were caught.

21  We're apologizing because we were caught.  If we hadn't been

22  caught, who's to say we wouldn't still be doing it today.  I'm

23  glad we were caught.  We've been stopped.

24    On a personal note, I've -- I've dishonored

25  everything I ever was.  I have lost every friend I've ever had,

1  and the only person I could probably talk to frankly would be

2  my sister.  And my future is over and that's okay, that's fair.

3          What I did I believe to be worse than what the others

4  in the group did.  It is deeply ingrained in me to know -- to

5  know right from wrong, to look out for people, and I didn't, I

6  didn't.

7          The people in the back of the room who are not here

8  today from yesterday probably see me as a monster and that's

9  also fair.  That's -- that's what I've become, I've become the

10 monster.  I did it.  I believe that's who I will be for rest of

11 my life.

12         And that's all I have to add, Your Honor.  Thank you.

13         THE COURT:  Okay.  Thank you very much, Mr. Massey.

14 I appreciate your words which I can tell are sincere as well.

15         Now, Mr. Mulcahy has risen on behalf of the

16 government, and obviously on behalf of the citizens of the U.S.

17 Mr. Mulcahy has the right to speak.

18         I was going to ask you, because I was flipping

19 through here, there's not a lot -- maybe I'm wrong, and if I

20 am, you correct me, but it doesn't seem like there's a lot of

21 detail in the memo I have in front of me.  It was filed on the

22 10th of July regarding the government's motion.  Is there

23 somewhere in the -- or a page number where I ought to look?

24         MR. MULCAHY: Your Honor, there's -- I tend to agree

25 with you, there's not a lot of detail about the cooperation of

1    Mr. Massey except -- and I intend to provide some in a moment.

2            THE COURT:  That's fine.

3            MR. MULCAHY:  Um --

4            THE COURT:  That's fine.

5            MR. MULCAHY:  Okay.

6            THE COURT:  I was going to say, you know, if you're

7    going to speak, but I was -- I was trying to read -- read

8    anything, and -- and if there's not a lot of writing, that's

9    understandable and fine, but I am interested obviously in

10   your -- your grounds.  And I know your recommendation is to

11   come down from life sentence, lower than 50, lower than 40, to

12   35 years to help accomplish the goals of 3553 and to support

13   your motion, so I'm -- I'm aware of all that, but you know

14   where we're at and you can go right ahead.

15           MR. MULCAHY:  Thank you, Your Honor.

16           And for purposes of the -- of the record, I would

17   incorporate all of yesterday's proceedings, the victim

18   statements, all of the arguments of counsel and the Court's

19   thoughts in every sentencing that was there yesterday and pay

20   them all forward today.  And so I won't spend time talking

21   about the enterprise.  I won't spend much time frankly talking

22   about the victims because we've -- we've spoken about them and

23   we've heard from them and I can't improve on what they said.

24           But instead, I'm just going to say just a few minutes

25   worth about Mr. Massey, and I want to talk about three things,

1    Your Honor.  First is what -- what part he played.  I think
2    it's fair for -- as the Court decides the appropriate sentence,
3    it heard about each and every defendant yesterday and some of
4    the -- the role that they played and I'll provide that to the
5    Court.
6         Second is a bit of a response to some of the
7    mitigation made both today by Mr. Plotkin as well as in his
8    sentencing memorandum.
9         And then lastly, ultimately what the government's
10   recommendation is and how we landed on 35 years.
11        So first let me start with Mr. Massey's role.  Like
12   others in the group, he was an active talker.  The recovery of
13   his devices yielded over 15,000 child exploitive images and
14   videos, over 7500 child pornography videos; it was over
15   1900 hours of content.
16        Yesterday I talked at length about the -- how the
17   enterprise collaborated, how they strategized and schemed
18   through various Skype chats.  A search on those Skype chats
19   yielded that Mr. Massey made about 50,000 comments through the
20   life of this group.  These were his friends, these were his
21   cohorts, and he spent his time and energy talking to them at
22   length.
23        Now, Mr. Massey I will say, to -- to down that number
24   a bit from 50,000, not much but a bit from 50,000, was a bit
25   more social than some of the others about the content.  He

1    talked about politics and soccer and sports and Marine Corps

2    and other things like that, but the overwhelming majority of

3    the comments were the sexual exploitation of these girls.  He

4    was a member of this group for about three years, and according

5    to the login information from Website A, if you averaged out

6    the number of chat rooms he logged in to, it would be about 18

7    per day.

8              So I say all that, all of that math to say that Mr.

9    Massey was a very active member of this group.  As a very

10   active member, his role was principally in talking to the

11   girls, and he did loop occasionally but he was mainly a talker

12   with the girls.  Mr. Massey's view on talking to the girls was

13   he would speak frequently with them, and we have recovered

14   Skype chats where Mr. Massey was challenged by at least one

15   other Skype Group member and -- and sort of I guess reprimanded

16   for talking too much to some of the girls, and Mr. Massey's

17   response, which I included in my sentencing memorandum, was "I

18   like to fill in the silence to keep the girls sort of

19   interested," again in advancing the -- the scheme that they

20   were doing here.

21             One of the things that makes Mr. Massey different

22   than his others though, while it hurt him and it hurt the group

23   as far as evidence goes, it helped him in the sense of his

24   cooperation.  Mr. Massey kept thousands of videos as we talked

25   about of child pornography from Website A and Website B, but

1    within that he kept not just the girls undressing or the girls

2    engaged in sex acts, he kept the chats themselves.  And it's

3    important for two reasons:

4            First, because he kept the chats and he recorded the

5    chats as well as the videos, he -- there was quite a bit of

6    evidence recovered on his computer that the government could

7    use, and it's part of the reason why he's been given such a

8    generous 5K in this case.

9            And but before I get to that, I would say the other

10   thing that's important is Bret Massey's sexual interest in

11   teenage girls stems not simply from viewing their exploitation

12   but also the enticement and the luring that leads up to it.  In

13   his own words he says, "I like to remember what she is reacting

14   to."  That is particularly troubling frankly for Mr. Massey and

15   his hopes of not repeating should he return to society.

16   Because that enticement is luring, that kind of enticement

17   requires one-on-one or group-on-one interactions with real

18   girls, I'm not sure pictures and videos will do it for Mr.

19   Massey and that is a concern of ours.

20           I indicated earlier that he was an aggressive talker,

21   and I've provided just a couple of examples here and it's the

22   last I'll say about his role in the offense.  He sort of mocked

23   some of these girls about being suicidal or cutting themselves.

24           And as far as age of the victims go, one of the -- a

25   different offender in this group, the one who has not yet been

1    sentenced, suggested to the group on a Skype chat that "we

2    needed some 12-year-old twins to liven this place up," to which

3    Mr. Massey replied, "I like the way you think."

4            He had a video or described a video he was sharing

5    with the group of a girl he described as negative seven, which,

6    as Your Honor knows, is how they refer to age away from 18, so

7    that means that was an 11-year-old girl.

8            So I say that, all of that, to sort of put Mr. Massey

9    on a level playing field with the others that you heard

10   yesterday and that offering to the Court his conduct in this

11   case.  He was right in the center of it all.

12           But as a result -- but I'll pivot from there to talk

13   about his cooperation, and I want to give the Court more

14   information than we gave in our written memorandum as to why

15   Mr. Massey deserves a 5K in this case.  As I indicated, he kept

16   videos, thousands of them, with the chats included, and while

17   that was disturbing as far as Mr. Massey's sexual interests in

18   children, it was helpful in that it provided realtime dialogue

19   that we could replay with what the victims saw and heard so

20   that we could show that these victims were told what to do when

21   they were sexually exploited.  That proved very meaningful.

22   Mr. Massey was forthcoming about those videos and where we

23   could find them and told us what we would find.  Virtually

24   everything Mr. Plotkin said on this point is true.

25           We used Mr. Massey's statements both in Maine and

1   back here in Detroit when we sat down with him in search

2   warrants.  We used them in complaints and we used them sort of

3   in going forward, including recently as we made further arrests

4   in this case.  In other words, he proved to be one of the most

5   significant cooperators of the group, which is why he's been

6   rewarded with this 5K.  His information plus what was found on

7   his computers have led us to further the probable cause that

8   led to search warrants and complaints.

9          And so that is -- and I also believe frankly that Mr.

10  Massey would have been willing and able to testify should that

11  need have arisen or had arisen.  And so for those reasons we

12  made the 5K recommendation for him.

13         Beyond his cooperation though, the other mitigation,

14  with -- with due respect to -- to Mr. Plotkin, I think is

15  somewhat unmoving.  I -- I recognize that Mr. Massey is 47,

16  about to be 48 later this year.  A 20-year sentence with good

17  time credit, which I'm sure Mr. Massey will do his best to --

18  to earn, will get him out right around his 65th birthday.  In

19  this courtroom, this courthouse has seen several child

20  exploitation offenses by individuals in their 60s and even 70s,

21  that is not uncommon.  A 20-year sentence would not protect the

22  public in our view.

23         So the question about what is to be achieved from

24  something of more than 20 years, Mr. Massey's significant

25  interest, sexual interest in children will last longer than the

 1    17 and a half years he would get should the Court impose the

 2    mandatory minimum.  And even though the government recommends a

 3    variance in this case, a variance down to 35 years will still

 4    give him life after prison.  If he gets credit for good time,

 5    by my calculations at least, he will be out in his mid-70s and

 6    still have a life after the fact going forward.

 7         And so the issues about Mr. Massey's father, I wasn't

 8    privy to the phone calls that Mr. Plotkin was.  I think some of

 9    those issues, frankly they just don't amount to a reason or

10    justification or really an explanation as to why Mr. Massey

11    chose this life for himself and painted this future for

12    himself.

13         So with -- with those mitigation, Your Honor, we

14    don't think that they amount to a variance, but Mr. Massey's

15    conduct deserves a life sentence.  We said that in our

16    sentencing memo and we stand by that now.  He was at the center

17    of it all.  He has a sexual interest in teenage and preteen

18    girls.  But he really stepped up, and as a result of his

19    cooperation the government recommends 35 years in custody.

20         THE COURT:  Okay.  All righty.  Thank you very much.

21         I am going to talk about some of the 3553(a) factors

22    and I'm going to justify the sentence that I intend to give and

23    then I'm going to state the sentence I intend to give and I'm

24    going to give both the lawyers an opportunity to speak about

25    it, object to it if necessary.

1      I mean the -- the -- the number one thing for this

2  judicial officer that leaps off the page of the Pre-Sentence

3  Report is the service obviously that Mr. Massey gave to our

4  country as a member of the Marine Corps and the son of a member

5  of the Marine Corps as well.

6      I saw a, you know, a Princeton educated Ph.D. here

7  yesterday and we have a marine officer here today, and we've

8  had, you know, professors and priests.  And, you know, I can

9  only imagine that in terms of motivation, the serious mental

10  health issues that Mr. Plotkin points out along with Mr.

11  Mulcahy's puzzlement that leads to this type of thing would

12  result in me concluding that the impulses and the addictive

13  qualities of this type of behavior must be so incredibly strong

14  that you're -- you're willing to basically give up everything.

15      I've tried to fashion sentences that have been both

16  consistent across the board in terms of the amount of activity,

17  the protection of the public, the fear that the victims have

18  that this will happen to them again, along with the amount of

19  involvement in the enterprise and to temper that with some

20  sense of I think I used the term mercy yesterday.  None of

21  these folks have prior criminal conduct and each one of them

22  has some reason for why they likely got involved in this.

23  Whether they know what that reason is or not, I think there's

24  things that competent mental health professionals could --

25  could point to.

1          I would have -- I -- I -- I say that all as

2     background that I found the fellow from California, name on the

3     tip of my tongue, who had moved to Reno among the most active.

4     There's another individual, I forget his name, who was more

5     active.  And I -- I don't know that I did this by design, but I

6     look today at the fact that every sentence I gave yesterday was

7     over 400 months, and for those two it effectuated sentencings

8     of 36, 37 years, 444 months and -- and beyond.

9          I would have probably had Mr. Massey in that general

10    range, and the reason that -- the reason I -- I would have done

11    that is from reading everything and by his own admission, I

12    think Mr. Massey was involved heavily.  And -- and by the way,

13    I don't hold the own admission by Mr. Massey about his

14    involvement against him.  I think that's actually quite a good

15    thing as we don't see a whole lot of -- a whole lot of honesty

16    frequently at these types of affairs.  But -- but anyway,

17    the -- the sentence has to be fashioned with what happened at

18    the time.

19         With all that in mind, I think I would grant a -- a

20    384-month sentence, which would be five years off of -- which

21    would be five full years off of the sentence of the fellow from

22    California, Terry -- what's his name, Mr. Mulcahy?

23         MR. MULCAHY:  Terry Kovac, Your Honor, Terry Kovac.

24         THE COURT:  Kovac.  So assuming Mr. Massey and Mr.

25    Kovac were similarly situated, and I do believe in looking at

```
1    the file they mostly were, five years off of that would be
2    appropriate for a -- a -- a 5K motion based on substantial
3    assistance, which, as Mr. Mulcahy said, was limited by the fact
4    that the individual was in custody when he gave the assistance,
5    which didn't involve testimony or active work but which did
6    substantially aid the United States in obtaining all the
7    evidence necessary to round up, prosecute and address all the
8    people who were indeed involved.
9            I think I owe it to Mr. Plotkin to -- he's been very
10   honest with me and I'll be very honest with you all.  Why not
11   20 years?  And there's just a sense of me as a person that
12   the -- the mandatory minimum, while it -- it would certainly
13   effectuate all the sentencing factors that I'm concerned about,
14   which would be rehabilitation, safety of the public and
15   deterrence, would -- just doesn't go far enough.  I think this
16   is among the most severe sort of enterprises, criminal
17   enterprises that -- that we've seen here, and I think that the
18   most drastic punishment is necessary and I just don't feel
19   comfortable going to the bottom end.
20           I -- I -- I do think some mercy and the opportunity
21   for these folks to end life out of prison and contribute and
22   redeem is -- is desirable, but there's a sense in me that the
23   bottom end of the statutory prison range that was established
24   by Congress would be too low.  So that's the reason for the
25   sentence and it's what I would intend to impose now.
```

1           So therefore, it's the judgment of the Court,

2    pursuant to the Sentence Reform Act of 1984, having considered

3    all the sentence guidelines and factors in 18 USC, Section

4    3553(a), that the defendant, Bret Massey, be sentenced to the

5    custody of the Bureau of Prisons for a term of 384 months.

6           It's further recommended that the defendant be

7    designated to an institution with a comprehensive sexual

8    offender treatment program.

9           Upon release from imprisonment, the defendant shall

10   be placed on supervised release for 10 years.

11          The defendant shall pay a special assessment of a

12   hundred dollars.  That will be due immediately.

13          It's ordered that the defendant pay a Justice For

14   Victims Traffic Act, JVTA, assessment of $5,000.

15          The Court's aware that the parties agree to a

16   restitution amount of $5,000 per identified victim for a total

17   of $215,000.  No interest, penalties or fees on the restitution

18   amount.

19          The Court will waive the imposition of a fine, costs

20   of incarceration and supervision as I mentioned earlier due to

21   Mr. Massey's negative cash flow and lack of overall financial

22   resources.

23          However, while in custody, Mr. Massey must

24   participate in the Inmate Financial Responsibility Program,

25   IFRP.  I am well aware of the requirements of that program and

 1   approve the payment schedules of the program and hereby order

 2   the defendant's compliance.

 3          Mandatory drug testing will be ordered on supervised

 4   release in light of the history with alcohol noted in the

 5   report.

 6          While on supervision, Mr. Massey must abide by the

 7   standard conditions adopted by this Court regardless of where

 8   he resides, and he also must comply with the following special

 9   conditions.  I'm going to summarize them since they were

10   completely put on the record at least once yesterday and

11   they'll be completely set forth in the Judgment and Commitment

12   Order that we filed in the case.

13          But obviously Mr. Massey has to comply with the

14   requirements of the SORNA.  That's the Sex Offender

15   Registration and Notification Act that requires him to register

16   with any state registration agency.

17          He must successfully complete sex offender diagnostic

18   evaluations, treatment and counseling programs as directed by

19   probation while on supervised release.

20          He must be available and submit to periodic

21   polygraphic testing if the probation officer wants him to to

22   ensure that he's complying with supervision and his treatment

23   goals.

24          He should not and shall not associate with minor

25   children under the age of 18 except if another adult is around

```
 1    and if the probation officer approves.
 2              He shall notify anyone that he dates or marries that
 3    has a minor child under the year -- age of 18 of this
 4    conviction.
 5              And he shall not purchase, sell, view, possess or
 6    look at in any form of media or live venue pornography,
 7    sexually explicit conduct, child erotica and child nudity.
 8    Should not patronize any place where those types materials are
 9    available either.
10              Employment must be pre-approved by the Probation
11    Department.
12              Residence must be pre-approved by the Probation
13    Department.
14              And the defendant must provide the probation officer
15    with accurate information about all of his computer systems as
16    well as abiding by the rules of the Computer Monitoring Program
17    of the U.S. District Court's Probation Office here in Eastern
18    Michigan.
19              Mr. Massey must submit his person, residence, office
20    and vehicle if requested to search by the probation officer if
21    the probation officer feels there's reason to do that.
22              He shall not have contact, directly or indirectly,
23    with any victim or witness in this case.
24              He shall have employment pre-approved by the
25    Probation Department.
```

1    If employment requires use of the computer, he has to

2    tell his employer about this conviction, and that notification

3    of the employer has to be confirmed by Probation.

4    Shall not possess any camera or own any camera,

5    photographic device or equipment, including video recording

6    equipment, without prior approval of Probation.

7    Given the alcohol issue I mentioned before, the

8    defendant shall not possess or use any alcohol in a consumable

9    form, nor shall he be in the social company of any person who

10    he knows to be in possession of alcohol or drugs, illegal

11    drugs, or frequent an establishment where alcohol is served for

12    consumption on the premises with the exception of dining

13    establishments or restaurants.

14    No new credit charges, no additional lines of credit

15    giving the -- given the restitution amount.

16    And access to any requested financial information

17    must be provided to the probation officer upon asking.

18    Finally, make monthly installment payments on any

19    remaining balance of the fine or special assessment.  That

20    payment plan, if there is any, has to be recommended by

21    Probation and approved by the Court.

22    That's the sentence that the Court intends to give on

23    this matter.  Any objections, Mr. Mulcahy?

24    MR. MULCAHY:  No, Your Honor.

25    THE COURT:  Mr. Plotkin?

1    MR. PLOTKIN:  No, Your Honor.

2    THE COURT:  Okay.  Without objection, the sentence

3   that the Court stated earlier will be imposed.  The defendant,

4   Mr. Massey, has waived his right to appeal his sentence.  The

5   reason the waiver of the sentence appeal is valid is because I

6   sentenced below the guideline range in the case.  And the --

7   the Plea Agreement contemplates as well a waiver of the right

8   to appeal the entire conviction.

9        If, Mr. Massey, you think that your waiver is not

10   valid, you can take that up with the U.S. Court of Appeals

11   directly, but those things have been found to be valid in the

12   past.

13        The defendant will be remanded to the custody of the

14   marshal to continue the service of his sentence.

15        The PSR was complete and correct.  Final copy will be

16   sent to the Bureau of Prisons and the Sentencing Commission.

17   Any other copies are to be kept strictly confidential.

18        And that's it from here.  Anything else from the

19   lawyers?

20    MR. MULCAHY:  Yes, Your Honor.  On behalf of the

21   United States, pursuant to the terms of the Rule 11 Plea

22   Agreement, the government moves to dismiss Counts 2, 5, 6, 7

23   and 8.

24    THE COURT:  Okay.  That's -- those are dismissed

25   without objection on order of the Court.

Sentencings • Wednesday, July 18, 2018

32

1          Anything else from Mr. Plotkin?

2          MR. PLOTKIN:  No, Your Honor.

3          THE COURT:  All right.  Thank you for your hard work.

4     Good luck, Mr. Massey, and I hope you get what you

5     need.  And -- and, you know, it's hard for me to say, nobody

6     likes to do this, but there's some sense where you can redeem

7     and rebound and I'll pray for that for you, all right?

8          DEFENDANT MASSEY:  Thank you, Your Honor.

9          THE COURT:  All right.  Good.

10          MR. PLOTKIN:  Thank you.

11          THE COURT:  All right.  You're welcome.  Have a good

12     afternoon.

13          MR. PLOTKIN:  Thank you.

14          (Proceedings concluded at 12:41 p.m.)

15                        —   —   —

16

17

18

19

20

21

22

23

24

25

```
 1              Detroit, Michigan

 2              Wednesday, July 18, 2018

 3                       —  —  —

 4              (Proceedings commenced at 12:41 p.m., all parties

 5              present)

 6              THE COURT:  Next up?

 7              THE CLERK:  Court calls --

 8              THE COURT:  Can we take 30-second -- 30-second

 9      recess?  I just need something in the back.

10              THE CLERK:  All rise.  Court is now in recess.  You

11      may be seated.

12              (Court in recess at 12:41 p.m.)

13              (Proceedings resumed at 12:42 p.m.)

14              THE COURT:  You may all be seated.

15              Do the marshals need to move anyone around or -- no?

16      Okay.  Good.  Let's continue.

17              THE CLERK:  Court calls Case No. 17-20632 and

18      18-20128, United States of America versus William T. Phillips.

19              THE COURT:  You should introduce yourselves.

20              MS. RUSSO:  Good after -- good afternoon now, Your

21      Honor.  April Russo on behalf of the United States.

22              MS. DWYER:  Your Honor, good afternoon.  Lisa Dwyer

23      appearing on behalf of William Phillips.

24              THE COURT:  Welcome.  And you're right, you did

25      introduce yourselves earlier so my error.
```

1          Mr. Phillips, we are here for sentencing on two

2     cases, and I believe there's a report which is fairly identical

3     on -- on both cases.  Have you had an opportunity to read over

4     both of those with your lawyer and to understand what's in

5     there and lodge any objections?

6          DEFENDANT PHILLIPS:  Yes, Your Honor.

7          THE COURT:  Okay.  Very good.  With regard to

8     17-20632, that's the case that we've been dealing with for the

9     past couple of days, there's one objection by Mr. Phillips

10    regarding 3A1.1(b)(1).  That's the vulnerable victim

11    enhancement of two points which was set forth in paragraph 44.

12    We had a little argument in another case about whether these

13    victims were vulnerable yesterday and I -- I -- I -- I -- I

14    know that's a legal issue that you may want to argue.  I

15    don't -- I don't preclude you from doing it.

16         But my general sense, Ms. Dwyer, based on the law of

17    the cases and the undisputed facts here, you've got these minor

18    children with limited judgment and maturity, and they were in a

19    vulnerable situation because of the up and down power structure

20    of the enterprise and the computer communications had.  But

21    again, that's my sense.  If you'd like to argue that objection

22    and say something different, you go right ahead.

23         MS. DWYER:  No thank you, Your Honor.

24         THE COURT:  Okay.  All right.  Very good.  Then the

25    objection is noted and I will overrule it and find that the

1    enhancement, two points under 3A1.1(b)(1), applies, and -- and

2    go from there.

3            There are no objections on 18-20128.

4            And so let me just ask you, Ms. Dwyer, as to both

5    Pre-Sentence Reports, do you have any further objections,

6    corrections, other matters you want to take up at this time?

7            MS. DWYER:  None, Your Honor.

8            THE COURT:  Ms. Russo?

9            MS. RUSSO:  Your Honor, the only thing I want to note

10   is that the defendant, Mr. Phillips, specifically requested we

11   consolidate these sentencings, and it's to his benefit to do so

12   in terms of the criminal history points, so I just wanted to

13   note that that was his request which we've complied with in

14   doing this hearing.

15           THE COURT:  Well, that's fine with me because at the

16   end of the day we're talking about 43-I in both cases, and

17   unremarkably that results in a -- a life sentence, and I don't

18   really see any need to do any grouping or, you know, criminal

19   history enhancements, but I'm glad you said that.

20           And if you don't have any objections, I'll find that

21   the Offense Level is 43, Level I on both cases.  That calls for

22   a guideline sentence of life in prison.  The Plea Agreements in

23   both cases match up with that.  And again, for purposes of this

24   proceeding, I'll rely on the factual findings of the Probation

25   Office for the factual conclusions of the Court.

1      I will tell you it's my intent to enter a sentencing

2  term in the 17 case and then enter the same term in the 18 case

3  and make them concurrent.  I'm sure you're not surprised by

4  that.  But again, I don't -- to use a term I heard yesterday, I

5  don't see the need for any additional piling on.  But we have

6  two cases, two enterprises, two sets of circumstances.  Mr.

7  Phillips pled guilty to both of them.  We'll sentence on the

8  overall behavior, but I -- I -- I think in all likelihood the

9  consolidated term on one would be sufficient to take care of

10  the other.  So that's where we're at, okay?

11      All right.  Very good.  Let's move forward a little

12  bit and for the record state, as I have earlier, that

13  forfeiture's not going to be an issue in the case because the

14  parties have agreed not only on a Preliminary -- Preliminary

15  Order of Forfeiture but in open court yesterday terms of their

16  agreement that can be memorialized in the Judgment and

17  Commitment Order.

18      The defendant is facing a very long sentence and has

19  minimal financial resources and so therefore I won't impose a

20  fine or costs of incarceration.

21      There's a restitution agreement in the amount of

22  $235,000; that's $5,000 per victim in both cases.  And --

23  and -- and that's another reason, given the amount of the

24  restitution sum that should go to the victims, why a fine would

25  not be appropriate.

1          Victim testimony, impact statements and extensive

2    victim information was presented yesterday.  I don't think we

3    need to go through that.

4          There is not a ground for a departure, but I do know

5    that both the United States and the defendant, of course, are

6    seeking a variance of some sort; the United States a mild

7    variance, Ms. Dwyer, a variance to the mandatory minimum.

8    We'll hear argument on those issues.

9          And is there anything I'm missing, Ms. Russo?

10         MS. RUSSO:  Just two quick things, Your Honor.  This

11   defendant was not a part of the same two groups as some of the

12   other defendants.  His restitution was therefore a little

13   higher; it was 320,000.

14         And the only other thing, Your Honor, is we are

15   asking for a 5K downward departure in this case as well.

16         THE COURT:  Oh, okay.  I didn't know that.  That

17   shows you that I was busy this morning and I didn't review Mr.

18   Phillips' sentencing memorandum from the United States, but I

19   have that here and I'll go through that as well.  Okay.  All

20   right.  Thanks for those corrections.  I appreciate that.

21         Ms. Dwyer on behalf of her client, as she does in

22   every case, has the right to make any comments or remarks on

23   behalf of Mr. Phillips as to the -- as to the sentence,

24   mitigating factors or anything else, and I'd be delighted to

25   hear from you now.  Go right ahead.

1          MS. DWYER:  Thank you, Your Honor.

2          I'll start with the fact that the government is --

3    has asked or suggested, and -- and perhaps in some degree they

4    are correct, that everybody in this conspiracy, or perhaps in

5    Mr. Phillips' case the two conspiracies, deserves life.  And to

6    show that the 20-year mandatory minimum is only for the least

7    offender, they've given examples of possible offenders which,

8    I -- I'm sorry, I don't think they would ever charge with a

9    child exploitation enterprise.  This child exploitation

10   enterprise, as serious as it was and as serious as Mr.

11   Phillips' conduct was, his -- there are people in these

12   enterprises who act and are much worse, for whatever that's

13   worth, and I'll give you an example.

14         Though Mr. Phillips had conversations with what --

15   with a young lady who turned out to be 11 years old, and though

16   he engaged with individuals who were very damaged and

17   vulnerable to him, and from what I understand, one of them

18   attempted suicide and possibly more, however, what he didn't do

19   personally was blackmail these girls into taking their clothes

20   off or to showing or masturbating like -- like many of the

21   other co-conspirators did do.

22         He did not threaten them to put -- post their videos

23   online if they didn't continue doing what he asked.

24         He never threatened to expose them to their parents.

25         He never shared his videos.  He never shared his

1    content with anyone.  He nev -- this Court can be rest assured,

2    and I hope the victims are too, when it comes to Mr. Phillips,

3    whatever content, whatever recordings he had on his computer

4    were never made into videos and were never shared.

5         The -- there were creators of these sites who Mr.

6    Phillips informed on, people who made the rules and -- and

7    actually were responsible for hunting the girls, and Mr.

8    Phillips was not that person.

9         I will say this.  And he fully recognizes that the

10   fact that he participated in these groups, that he encouraged

11   others to do those other things, and that's true.  But when it

12   comes to comparing this group to a gang, I would liken it more

13   to a cult because I think the Court made an interesting comment

14   that I would agree with, that once people are in this, they

15   don't seem to be able to get out of it emotionally,

16   psychologically, mentally, and I do think it's more like a

17   cult.

18        But using the -- the comparison to RICO, if this were

19   a RICO conspiracy and Mr. Phillips had given up information on

20   both named co-conspirators and unnamed co-conspirators who were

21   certain to be arrested or tracked down soon based on the

22   information he's given to them, that giving those information

23   about people who are higher up the chain than him on at least

24   nine search warrants the government has acknowledged in

25   complaints, to have similar information he gave was used I'm

```
 1    positive, his testimony, in the grand jury, you know, these are
 2    situations where the government would be making a
 3    recommendation based on that nature of cooperation.
 4            And the reason this is so important is because Mr.
 5    Phillips took active measures that shut down the entire second
 6    conspiracy, the Bored Group, the 18 case.  Each of those
 7    co-defendants, Christian Maire, Arthur Simpatico, Jonathan
 8    Rodriguez, Michael Figura, Odell Ortega, Rex Sinta, Caleb
 9    Young, Daniel Walton, it was -- he was involved with their
10    arrest and their searches, and they were brought in very
11    quickly thanks to the information he provided.  So the nature
12    of his cooperation shouldn't -- can't be underestimated in its
13    import.
14            The other thing I wanted to point out, preempting
15    some of the government's comments since I go first, the Bored
16    Group wasn't really outlined in their sentencing memorandum in
17    terms of the content on their computers and the nature of their
18    images and even the roles of those defendants because it was
19    believed that, you know, Christian Maire was developing these
20    onsite -- these -- these actual chat rooms or that, yeah, Mr.
21    Simpatico actually developed these sites and the rules.
22            That Mr. Phillips when he was first detained in New
23    York, he cooperated, and it took 41 days to get him to Michigan
24    where he could resume his cooperation.  After cooperating in
25    Michigan here in September, the first arrest based on
```

1     information that he provided was I believe in October.  If

2     those 41 days had not been there, the time it took to transport

3     him, the Bored Group would have been shut down faster and

4     locations of these individuals, the identifying information

5     would have been brought to agents' attention sooner and could

6     have resulted in a quicker shutdown of that group.  And it

7     should be noted that at the time that Mr. Phillips was

8     answering questions regarding the Bored Group, though it was on

9     their radar, he was really filling in a lot of the blanks.

10          So then he's charged in the second conspiracy that at

11    the same time he was instrumental in bringing down is -- is I

12    think extremely relevant to the nature of his cooperation.

13    There are individuals in this 18 case that were involved in

14    this 17 case that hadn't been charged in the 17 case, and I

15    think that's relevant too in terms of disparities between

16    defendants.

17          The -- what we do know about the content of some of

18    the other individuals is that Mr. Phillips, hundred percent of

19    computer forensics team completed on his computer versus the

20    small percentages, 5.5 percent on Mr. Kovac's or 18.2 percent

21    on Mr. Robinson's, his contact -- his content shrinks in

22    comparison, and -- and -- and that's with full -- full

23    forensics done on his computer versus the small percentages on

24    some of these co-defendants, and theirs exceeds multiple times

25    what Mr. Phillips had.  It's hard to know how much more excess

1     there would be if they had a hundred percent of their forensic

2     reports done.

3             We don't have that for the Bored Group.  We can't --

4     I can't say to you, Judge, look at what Christian Maire did,

5     look at what Mr. Simpatico did.  But I'm asking you to consider

6     that though that information isn't provided to you, that that

7     group, bringing that group down was as important as bringing in

8     this first group that Mr. Phillips was caught up in.

9             And it's hard to accept a recommendation of 30 years

10    based on that and based on his role in these groups, though

11    like I said, his participation in this enterprise of course

12    encouraged others to go further than he did.

13            I'd also like to note that -- and I sort of lightly

14    touched on it, that because of the nature of Mr. Phillips'

15    cooperation and the fact that he gave information regarding

16    unnamed co-conspirators that are still under investigation is

17    reason to believe that there will be ongoing arrests based on

18    that information, which the Court will likely not see or hear

19    about because he will have already been sentenced.

20            Mr. Phillips, about him, the character letters that

21    he submitted, 36 total letters of 35 people, I thought what was

22    really important about each of these letters is that they, each

23    person knew the circumstances of Mr. Phillips' conviction and

24    they still wrote on his behalf, Your Honor, because they had

25    the benefit of the memories of Mr. Phillips before this

1    happened to him or he happened to it, the -- the letters of

2    people who have known him as coach, people who have known him

3    as friend, people who have known him as family and people who

4    have known him in the community.  And it's so rare that a sex

5    offender is even welcome into a community, much less being

6    welcomed back into the community with open arms on such a

7    serious crime.

8            Each of these individuals collected roughly a hundred

9    dollars each and -- and sent in two checks totaling $4,000.

10   And it's humble, the $4,000, it is, but it's an indication and

11   expression of their sadness for the victims as well as an

12   investment in this man and to show this Court their belief in

13   his -- his redemption.

14           Mr. Phillips has attempted, you know, in his own way

15   to rehabilitate this past year not only by his full cooperation

16   and disclosure to the government and absolute willingness to

17   constantly write me with any detail he could remember, often

18   several details that would be passed on with each letter to the

19   government.

20           These -- the other structured rehabilitation was the

21   reading, was the taking on, you know, taking on and absorbing

22   reading in a way to regain empathy or regain life, if you will.

23   The -- I'm an English major.  I know what the power of reading

24   can be.

25           THE COURT:  You're a what?

1          MS. DWYER:  I'm an English major.

2          THE COURT:  Oh, okay.

3          MS. DWYER:  I know the power of reading, and I know

4   that before we had counseling and all these other things, there

5   were books and books could help people, and Mr. Phillips did

6   what he could, and what he had were books and those books made

7   an impression on him.

8          THE COURT:  Right.

9          MS. DWYER:  And he has regained that empathy.

10         I think in the beginning you -- it's so hard to work

11  your way toward that when the first thing that's flashing

12  across everyone's eyes are, "What about my life?"  But this is

13  not about Mr. Phillips' life, it's about these young ladies,

14  and he has empathy for that.

15         I know yesterday that the government made a comment

16  about the show of remorse, and I would just say that everybody

17  grieves differently, that crying or not crying is not an

18  indication of someone's true remorse.  There's a lot of reasons

19  people can cry.

20         THE COURT:  Right.

21         MS. DWYER:  You know.  And I just -- I want the Court

22  to take that in consideration.

23         Also Mr. Phillips is a Criminal History Category I

24  despite the ongoing --

25         THE COURT:  You'd be surprised how many people come

1    in here and cry and it's ridiculous.

2            MS. DWYER:  Right.

3            THE COURT:  Okay.  Go ahead.

4            MS. DWYER:  Thank you, Your Honor.

5            THE COURT:  Yeah.

6            MS. DWYER:  He has a true Criminal History Category

7    I, and I would like you to take that into consideration despite

8    the fact that this is an ongoing crime.

9            And finally, Mr. Phillips is asking to be designated

10   in a facility in New York near where he resides or his family

11   resides, which would be either Otisville or Danbury if

12   possible.

13           THE COURT:  Okay.  All right.  Very good.  All right.

14   Thank you very much, Ms. Dwyer, for those remarks.

15           Mr. Phillips, you have the opportunity to speak now

16   on your own behalf as to the appropriate sentence.  Anything

17   else you'd like the Court to know, go right ahead.

18           DEFENDANT MASSEY:  Thank you, Your Honor.

19           I spent the whole night writing this down and then I

20   get up here and I don't know if I want to go word for word

21   because there's just so much going on in my head right now.

22           Before anything, nothing can change what happened.  I

23   caused a lot of damage.  I got involved.  It is nobody else's

24   fault but my own.  I started that.  I am so sorry to every

25   person that got hurt.

1          Yesterday I heard some things and I was like I didn't

2     take part of that and I naturally was to defend myself.  And

3     then I thought about it and I'm like, you know, I didn't take

4     part in some of those things, but I am -- just being there

5     alone enabled that and I'm to blame for that, and that caused

6     exponential damage, that's -- that's it.  I did that, it was my

7     fault.

8          So that's the first thing I want to say is that I am

9     truly sorry for that to all the victims, even the ones that had

10    been victimized in a similar crime, that -- that I -- I feel

11    for them, I'm so sorry.

12         I want to say that I told my family not to come.

13    Between an aging mother, a sister and a couple cousins with

14    younger kids, I did not want to put that financial strain on

15    them so I told them not to come.  I could guarantee if this

16    case was in New York, this courthouse would be full.  The

17    support I've gotten you've heard, I'm -- I'm shocked, people

18    coming out of the woodworks, people who know me, it's

19    unbelievable, every day.

20         I do want to thank Ms. Russo and Special Agent

21    Christianson.  He took me out of hell.

22         I -- I made it -- a little Alice in Wonderland

23    reference because she said I -- all I've been doing is reading

24    and reading, anything non-fiction or any classic I just want my

25    hands on.  I followed a white rabbit down a horrible rabbit

 1   hole.  Both Alice and I chose to do that.  The rabbit may have

 2   told -- brought me to the white -- to -- to the hole, but I

 3   went down it.  Instead of creating a wonderland, I created a

 4   hell, not just for me, for other people.  Instead of a dodo

 5   bird and a Cheshire cat, there were creeps and fools and this

 6   white rabbit continually showing you different places.

 7            He got me out of hell when he -- he made me realize

 8   what I was doing was just -- I was in the wrong spot, I was

 9   doing wrong things.  And because of him and Ms. Russo, eight

10   people are in custody, content is taken off the Internet.  I

11   helped reverse this.

12            I'm not proud of what I did obviously by any stretch

13   of the imagination.  But, Your Honor, last time we had -- when

14   I was in your courtroom for the Plea Agreement, I was a nervous

15   wreck.  The last Plea Agreement I walked in and I sat down and

16   this moment came on, said, "You helped -- you brought eight

17   people in, you helped save more people."

18            Can't change what I did, Your Honor.  I can't change

19   the damage I've done.  But you know what?  I made a step in

20   that direction.  And -- and that's just the beginning, that is

21   the beginning.

22            I don't know, I -- I could be here forever, I could

23   go on forever.  So again, I'm sorry for everything I've done.

24   It's not who I am, and I hope through my character letters you

25   can see I hopefully stand out from everybody else.  I -- I can

1    make a difference, Your Honor.

2              THE COURT:  Very good.

3              DEFENDANT PHILLIPS:  Thank you.

4              THE COURT:  All right.  Thank you, sir.  Appreciate

5    those remarks.

6              And I would note appended to Ms. Dwyer's sentencing

7    memorandum were a number of fairly remarkable written products

8    from family members, cousins, sisters, customers, business

9    partners, and I did read all those so I -- I recognize there is

10   a high level of family and other support here and that was good

11   to see.

12             Now, with that in mind, the U.S. Attorney has the

13   right to speak on behalf of the People of the United States.

14   Ms. Russo, I'm sure you would like to give your presentation as

15   to the appropriate sentence and mitigating factors or any other

16   factors and you can do that now.

17             MS. RUSSO:  Yes, Your Honor.

18             I would like to incorporate the -- the victims'

19   statements, Exhibits A through H, and those things, Your Honor,

20   as well as there was an in camera statement from a father of a

21   parent as to this defendant that the Court has heard.

22             With respect to Mr. Phillips, Your Honor, one thing

23   that I don't disagree with Ms. Dwyer or Mr. Phillips about is

24   that his cooperation was significant.  Mr. Phillips is one of

25   the most culpable individuals in both of these groups, and I'm

1    going to spend most of the time talking about the Bored Group

2    because that's really the group that he was most significantly

3    involved in.

4         But Mr. Phillips did meet with us immediately in

5    order to cooperate, and while we had potential locations on

6    these other individuals in his group that he was a part of, the

7    Bored Group, and while we most likely would have executed

8    search warrants there, he expedited that process significantly

9    by cooperating.

10        And that is important, Your Honor, because a lot of

11   the defendants, and I'm going to get into the Bored Group a

12   little in a minute, in the Bored Group were quite savvy.  And

13   there was a -- there was actually an article that went out on

14   Website A in May of 2017, and defendants in the Bored Group

15   were drilling through their hard drives, they were getting rid

16   of their computers, and so the sooner we got to their houses,

17   the better it was in terms of our investigation and the

18   evidence that was to be recovered.  So he got us there faster

19   and -- and I'm appreciative of that.  He didn't shut down the

20   Bored Group, that's going too far to say that, but he got us

21   there faster.

22        With respect to the nature and circumstances of this

23   offense, Your Honor, really you have to understand Mr.

24   Phillips' role in the Bored Group to understand this offense.

25   And if the Skype Group -- these two groups referred to

1   themselves as teams.  So if the Skype Group is a junior varsity

2   baseball team, the Bored Group was the varsity team.  They are

3   more dangerous and their offense conduct is more serious.  And

4   I know Your Honor is -- has a number of these defendants but

5   Mr. Phillips is the first one to be sentenced in this group.

6          Their conduct began in around 2011 and 2012, and they

7   were on another website, Your Honor, and they were targeting

8   girls on that website, and certain of the people on that

9   website would get points.  Every time they talked to a girl to

10  get her to engage in sexual activity or they looped to a girl

11  to get her to engage in sexual activity, they would get points.

12         And the people that got the most points were invited

13  to a VIP room on this website.  And the Bored Group came from

14  this VIP room because certain people in that VIP room were not

15  satisfied with just targeting girls.  They wanted to target

16  underage girls, girls under the age of 18, and so they migrated

17  to Website A to do that.  And so the best of these people at

18  talking to girls and getting them to engage in sexual activity

19  and looping to girls, the VIP people went to this other

20  website.

21         And that is why, Your Honor, that you should expect

22  that we will be asking for life sentences for several of the

23  Bored Group members and certainly for life equivalent sentences

24  for those that we don't ask for life for because this is such a

25  sophisticated group.  They're higher income.  They -- almost

1    all of them had children.  Almost all of them are married.

2    They are smart enough not to --

3              THE COURT:  Okay.  Well, we'll get to that when --

4    when --

5              MS. RUSSO:  Sure.

6              THE COURT:  Well, no, I suppose it's -- it's

7    appropriate to let me know about Mr. Phillips' involvement, but

8    those other folks, I -- I think we can dispense with their

9    activities because we're not going to sentence them right now.

10             MS. RUSSO:  Right.

11             THE COURT:  Thank you.

12             MS. RUSSO:  But one thing that Ms. Dwyer had said,

13   Judge Murphy, which is why I was sort of going into this a

14   little bit, is she had said look at the numbers of child

15   pornography videos and images on Mr. Phillips' devices.

16   There's so much less than these other people in the Skype

17   Group.

18             THE COURT:  Right.

19             MS. RUSSO:  And to understand that, you really have

20   to understand the Bored Group because all of the numbers for

21   these Bored Group defendants are going to be significantly less

22   because they were sophisticated and smart enough to know not to

23   save recordings or to have wiping software on their computers

24   or to discard their laptops on a regular basis.

25             And that's what Mr. Phillips did.  He dumped his

1    laptop early in 2015 and then he discarded another laptop a

2    year before he was caught by the FBI.  So the laptop that was

3    analyzed for purposes of this case had only a year's worth of

4    content on it and so that's why you're not seeing those high

5    numbers for Mr. Phillips or for other Bored Group members.

6    And, of course, many of them, like I said, also got rid of

7    evidence as well.

8                THE COURT:  Okay.

9                MS. RUSSO:  So with respect to some of the tactics

10   that were used by Mr. Phillips in this group that he was a part

11   of, the Bored Group, I won't go into detail about all of them,

12   but one of them that I attached several exhibits related to is

13   the trust sessions and the polls.  These tactics are -- are

14   different from the Skype Group.  The polls are something that

15   the Bored Group typically did where they would have everybody

16   vote to have a girl take off her shirt, and then they would

17   tell the girl, "Look, everybody voted for you to take off your

18   shirt so you have to do it."  And they would do -- they would

19   do successive polls to get the girls to engage in sexual

20   activity.

21            Trust sessions are when a girl was suicidal or

22   depressed, they would have what they call trust sessions to

23   build her trust so that she would then engage in sexual

24   activity for them.  And there's exhibits that are attached to

25   our memo as well that give examples of trust sessions.

1          So Exhibit C-1, in that exhibit the minor says she

2     has anorexia and bulimia and that she cuts and burns herself,

3     and then the group goes on to build her trust and then asked

4     her to engage in sexual activity.

5          Exhibit D involves a minor who's 13 years old who

6     this defendant in this chat and other defendants find out that

7     she has a lot of anxiety and that she's thinking about quitting

8     dance, and they joke about how then she'll have more time to

9     engage in masturbation and they get her to engage in sexual

10    activity.

11         Exhibit C-2 is similar.  It's a minor who says it's

12    her sixth day having gone without eating but she accidentally

13    ate fries that day, and they do a series of polls on that girl

14    to get her to engage in sexual activity.

15         So these are some of the quotes from these girls

16    about their -- the struggles that they're facing before they're

17    asked to engage in sexual activity.

18         This is one of the polls that I have up here on the

19    PowerPoint where one of the group members runs this poll and

20    then they say, "Look, everybody says you should take off your

21    shirt so you should take it off."  The poll is complete.

22    You've got to follow it because that's what it says to do.

23         So this particular defendant, Your Honor, is -- like

24    I said, stands out in terms of his culpability for a couple of

25    reasons.  You heard yesterday about the different roles that

1    each of those defendants played.  This defendant was not just a

2    talker; he was a hunter and a looper as well as a talker.  That

3    is different from all the defendants you heard about yesterday.

4         This defendant was specifically in charge for the

5    Bored Group of getting girls into the group so that they could

6    be targeted for sexual activity.  He specifically hunted Minor

7    Victim 1 in the Bored Group or Minor Victim 12 in the Skype

8    Group.  She's a victim of both groups.  She's the one that you

9    had heard from a father of her, Your Honor.  And he was

10   responsible for bringing her into the group.

11        She believed that he was her boyfriend.  They carried

12   on a relationship from June of 2015 to February of 2017, and

13   she told him at one point that every conversation they had was

14   sexual and she didn't understand that because she believed him

15   to be a 17-year-old boy, that's who she thought she was

16   communicating with.

17        And as Your Honor heard, this has completely wrecked

18   the family of this young girl who resides in the Eastern

19   District of Michigan, and it has caused significant harm and

20   trauma to the family of this then 14-year-old girl when Mr.

21   Phillips first hunted her for the group.  And she did come to

22   the group and she did engage in sexual activity for the group

23   numerous times because of Mr. Phillips.

24        MV-25, Your Honor, is this 11-year-old girl who he

25   told he would never cheat on her, that he was in love with her,

1    that he was 17.  This girl, when Mr. Phillips stopped talking

2    to her, started cutting herself and told Mr. Phillips and the

3    guys -- she pretended to be a friend of hers and went online

4    and told Mr. Phillips, "Hey, I'm cutting myself.  I -- this

5    friend of yours is cutting herself, you should talk to her."

6         She also talked about how her sister had attempted

7    suicide and how she understood why her sister had attempted

8    suicide because she didn't feel that there was a reason for her

9    to live anymore.

10        Those are just two of the victims that Mr. Phillips

11   acted as the boyfriend of.

12        THE COURT:  What -- what was the identifier you had

13   before MV-25, who -- who was that?

14        MS. RUSSO:  Your Honor, that was MV-1 for the Bored

15   Group, but she's also a victim in the Skype Group and she's

16   MV-12 in the Skype Group.

17        THE COURT:  All right.

18        MS. RUSSO:  This is the girl from Michigan.

19        THE COURT:  Okay.  Thank you.  Go ahead.

20        MS. RUSSO:  That's all I'm going to say about in

21   terms of his culpability and the conduct there, Your Honor.  I

22   just -- he is one of the most culpable of these offenders.

23        With respect to the history and characteristics of

24   this defendant, the only thing I wanted to point out there,

25   Your Honor, is that in his letter, which is very moving I felt,

1    but in the letter Mr. Phillips says that his business in 2016

2    fell apart and that's why he started doing this, Your Honor.

3    That's just not true.  Mr. Phillips started doing this in 2012

4    which was four years before his business fell apart.  So to

5    blame his business falling apart on this conduct and say that

6    that's what excuses it isn't believable for the government.

7        I agree that he has a huge amount of family support

8    and I find it remarkable that everyone got together to pay

9    restitution, but that's really something that speaks to Mr.

10   Phillips' family and friends rather than Mr. Phillips'

11   character himself since they had no idea that he was living

12   this life and doing these things.

13       Finally, Your Honor, I'll just say as a last point

14   here, when we think about protection of the public with respect

15   to this defendant, truly he has torn apart the lives of those

16   girls that believed they were dating him.  He had personal

17   contact with them that impacted them enormously and impacted

18   their families enormously, and I've given you just two examples

19   of many girls, and you heard the enterprise's overall impact on

20   numerous other victims, Your Honor, who he also had a part in

21   targeting.

22       And so I would ask that you honor the government's

23   recommendation and that you sentence Mr. Phillips to 30 years.

24       THE COURT:  All right.  Thank you very much.  I

25   appreciate the argument and the thought and effort that went

1    into it.

2          I am going to grant the government's motion for a

3    downward departure under 5K1.1 of the sentencing guidelines.

4          My -- why don't I speak to -- well, I'll speak to

5    both cases in a consolidated fashion, and as I stated earlier,

6    my -- my sentence was intended to be concurrent in both cases.

7    Life is the guideline in both and the departure decision will

8    fall from there.

9          So I'm going to talk about 3553(a), the cooperation,

10   and impose the -- or at least state the sentence I intend to

11   impose and then give both lawyers an opportunity to object.

12         We have two serious cases involving potential life

13   sentences with scads of -- of victims and involvement spanning

14   three years' time.  And even in the worst case yesterday

15   involving one of the cases which I suppose Ms. Russo is

16   referring to now as the Skype Group, the highest government

17   sentence recommendation was 600 months.  I recall the young man

18   from Arkansas who was in his early 30s and who I had some

19   serious concerns about and I gave a sentence of 41 years which

20   I thought to be appropriate.

21         Mr. Phillips is 39 and the government indicates he is

22   among the most culpable of the individuals involved in two

23   separate groups and should be, for the protection of the public

24   I believe, incarcerated in a similar manner which would take

25   him up to his -- roughly his 79th birthday if I were to impose

1    a -- a sentence of 480 months, which I believe to be, in -- in

2    good sense if I didn't want to give a life sentence, to be the

3    appropriate term in this particular case.

4         The government urges a sentence of ten years below

5    that of 360 months and a 30-year term on both cases because of

6    the cooperation of the defendant in identifying the members of

7    the -- the second group.  And like Ms. Russo and Mr. Mulcahy, I

8    agree that Mr. Phillips should get credit for the substantial

9    assistance that he provided in identifying and, as he said,

10   bringing in eight people in the second group.

11        Moreover, I am taken greatly with the family support,

12   the letters and especially the involvement of Mr. Phillips'

13   mother who I've never met but -- but from all indications is

14   a -- a very, very fine person and obviously quite committed to

15   the wellness of her son.

16        All that being said, this is one of the rare moments

17   when I cannot go along with the government's recommendation

18   because I think it is too steep.  I think that seven years of

19   credit as opposed to ten would not only give him more

20   consideration than Mr. Massey got for his information that led

21   to the prosecution of many of the people in the 17 or the Skype

22   case, but would also incentivize other people to cooperate in

23   the future, to reward him for the work that he did, but to

24   still, in my view, penalize, punish, keep safe people who --

25   who are subject and victim to this behavior that many people

1    would probably feel there should be no release whatever for.

2          I think that I for a couple of weeks now frankly when

3    I first got the probation reports have struggled with where to

4    come down, and my sense tells me that 396 months or seven

5    years -- excuse me, 33 years for this criminal activity in two

6    cases involving numerous defendants and victims along with the

7    significant cooperation and rehabilitation efforts that he has

8    is the appropriate sentence in the case.

9          Therefore, pursuant to the Sentence Reform Act of

10    1984, having considered the sentencing guidelines and factors

11    in 3553(a) that I just went over, hereby commits the defendant,

12    William Phillips, to the custody of the Bureau of Prisons for a

13    term of 396 months.

14          I recommend strongly that the defendant be designated

15    to an institution with a comprehensive sex offender treatment

16    program, and I also recommend that he be housed in the State of

17    New York close to his family as Ms. -- Ms. Dwyer urged me to

18    do.

19          Upon release from imprisonment, the defendant shall

20    be placed on supervised release for a term of five years.

21          It's further ordered that the defendant pay a special

22    assessment of a hundred dollars which will be due immediately.

23          It's ordered that the defendant pay a Justice For

24    Victims of Trafficking Act assessment of $5,000.

25          And I'm aware that the parties have agreed to a

1    restitution amount of $5,000 per identified victim.  In that --

2    in this case that leads to a payment of $330,000 I think you

3    said?

4            MS. RUSSO:  320, Your Honor.

5            THE COURT:  $320,000.  That will be the restitution

6    amount.  No interest, penalty or fee on that amount.

7            No fine, no costs of incarceration, no costs of

8    supervision due to the defendant's lack of financial resources.

9            In custody Mr. Phillips must participate in the

10    Inmate Financial -- excuse me, Inmate Financial Responsibility

11    Program, IFRP.  I'm aware of the requirements of that program

12    and approve the payment schedules of the program and hereby

13    order the defendant's compliance.

14            Mandatory drug testing will be suspended because I do

15    not believe that Mr. Phillips poses a high risk of future

16    substance abuse.

17            While on supervision the defendant shall abide by the

18    standard conditions adopted by the U.S. District Court for the

19    Eastern District of Michigan and he shall comply with the

20    following additional special conditions:

21            Number one, register as a sex offender pursuant to

22    the SORNA, 42 USC, Section 16901.

23            Successfully complete any sex offender diagnostic

24    evaluations, treatment and polygraph examinations ordered by

25    the probation officer.

1          Submit to periodic polygraphic testing at the

2     discretion of the probation officer to ensure compliance with

3     supervision.

4          Do not associate with minor children under the age of

5     18 except in the presence of a responsible adult and with the

6     approval of the probation officer.

7          Notify anyone that they date or marry -- excuse me,

8     notify, the defendant, anyone that he dates or marries with a

9     minor child under the age of 18 of his conviction.

10         Do not purchase, sell, view, possess or use any

11    images in any form whatsoever of pornographic depictions,

12    sexually explicit conduct, child erotica or child nudity.

13         Obtain employment pre-approved by the Probation

14    Department.

15         Have all residences approved by the Probation

16    Department.

17         And participate in the Computer/Internet Monitoring

18    Program administered by the U.S. Probation Department.

19         Submit, Mr. Phillips shall, submit his person,

20    residence, office, vehicles and papers to a search if the U.S.

21    Probation Department believes that there is reasonable cause of

22    contraband or evidence that might result in a violation of --

23    of supervision.

24         No contact, directly or indirectly, with any victim

25    or witness in the case.

1     Mental health issues are noted and we've addressed a

2  couple of them.  So therefore on pre-sentence -- excuse me, on

3  post-trial -- post-sentence release, the defendant shall submit

4  to psychological and psychiatric evaluations as directed by the

5  probation office.

6     He must participate in a program approved by the

7  Probation Department for mental health counseling.

8     And he has to take all medications prescribed by a

9  physician whose care he is under.  That would include a

10  psychiatrist and that would also include the dosages and the

11  times recommended.

12     The restitution order is large.  Therefore, Mr.

13  Phillips shall not enter any new credit arrangements, charge

14  anything on a credit card or open additional lines of credit.

15     He must provide the probation officer access to any

16  requested financial information.

17     And he must make monthly installments on any

18  remaining balance of the fine or special assessment.

19     The sentence on Case No. 18-20128 will encompass the

20  same terms, which is to say 396 months, identical circumstances

21  in terms of placement and post-trial release, and I will make

22  those two sentences concurrent in both cases so that the

23  overall term of incarceration will be 396 months.

24     I don't think I have anything else so I will ask Ms.

25  Dwyer whether or not she has any objections to the sentence we

1    intend to give.

2              MS. DWYER:  No, Your Honor.

3              THE COURT:  Ms. Russo?

4              MS. RUSSO:  I don't, Your Honor.

5              THE COURT:  Okay.  Without objection, the sentence

6    that I stated earlier will be imposed.

7              Mr. Phillips, your right to appeal was waived as part

8    of your Plea Agreement.  That means your conviction is not

9    appealable.  Your sentence would seem to be without appeal as

10   well since I gave a sentence below the guideline range.

11             Those waivers are usually enforceable.  If you don't

12   believe yours is, you can take that up directly with the Court

13   of Appeals.

14             The defendant will be remanded to the marshal's

15   custody for service of his sentence.

16             Both parties have copies of the Pre-Sentence Report

17   and complete, corrected copies will be sent down to the Bureau

18   of Prisons and the Sentencing Commission.

19             Before we finish, I've given my regard to the United

20   States Attorney for their work in the case and I've informed

21   each and every lawyer of our great appreciation for your hard

22   work.  That goes no less for Ms. Dwyer than anybody else.  We

23   appreciate your work on behalf of the clients and your great

24   service to the Court.

25             I would like to say something about Ms. Danysh who is

1  in court here today.  She's the probation officer and she did

2  seven extensive Pre-Sentence Reports and has been with us

3  yesterday and today, and on behalf of our judicial officers, I

4  would like to thank you and your colleagues for your continued

5  support in our efforts.

6          Mr. Phillips, I find you, without the circumstances

7  of this offense, to be a person who obviously has a lot of

8  family and friend support.  You've got a lot of people out

9  there.  There's still time.  I'd urge you to do your best in

10  the intervening years and I wish you the best of luck, okay?

11          All right.  Very good.  Anything else from anybody

12  else?

13          MS. RUSSO:  Only dismiss counts in both cases, Your

14  Honor, at this time.  In the 17-20632 case, I will dismiss

15  Counts 2, 5, 6, 7 and 8 pursuant to the Plea Agreement.  And in

16  the 18-20128 case, I will dismiss Counts 2, 3, 4, 5, 6, 7, 8, 9

17  and 10 against Mr. Phillips.

18          THE COURT:  Okay.  Those will all be dismissed

19  without objection and we'll be in recess now.

20          THE CLERK:  Court is now in recess.

21          (Court in recess at 1:35 p.m.)

22                                    —  —  —

23

24

25

```
 1              C E R T I F I C A T I O N

 2          I, Linda M. Cavanagh, Official Court Reporter of the

 3   United States District Court, Eastern District of Michigan,

 4   appointed pursuant to the provisions of Title 28, United States

 5   Code, Section 753, do hereby certify that the foregoing pages 1

 6   through 64 comprise a full, true and correct transcript of the

 7   proceedings held in the matter of United States of America vs.

 8   D-3 Bret Massey and D-5 William Phillips, Case Nos. 17-20632

 9   and 18-20128, on Wednesday, July 18, 2018.

10

11

12                     s/Linda M. Cavanagh
                       Linda M. Cavanagh, RDR, RMR, CRR, CRC
13                     Federal Official Court Reporter
                       United States District Court
14                     Eastern District of Michigan

15

16

17   Date: August 18, 2018
     Detroit, Michigan
18

19

20

21

22

23

24

25
```